[No. 23222. Department One. December 2, 1931.]

HUGO HAAGA, *Respondent*, v. SAGINAW LOGGING COMPANY et al., *Appellants*.[1]

[1]Reported in 5 P. (2d) 505.

368

*John C. Hogan* and *Thomas S. Grant,* for appellants.

*L. B. Sulgrove,* for respondent.

PARKER, J.—The plaintiff, Haaga, commenced this action in the superior court for Grays Harbor county seeking recovery of damages for personal injuries which he claims he suffered as the result of the negligence of the defendants, logging company and Aubert, its motorman, in the operation of its gasoline railway motor upon its railway over a county road grade crossing.

Haaga was riding in a Chevrolet sedan automobile owned and being driven by M. S. Hubbard northerly along the county road over the railway crossing when it was struck by the motor, which was proceeding easterly on the railway, resulting in his very serious injuries for which he claims recovery. The cause proceeded to trial in the superior court, sitting with a jury, and resulted in verdict and judgment awarding to Haaga recovery against both defendants in the sum of forty thousand dollars, from which they have appealed to this court.

The logging company has been, for a period of several years past, engaged in extensive logging operations in Grays Harbor and Pacific counties. While its principal office has been maintained at Aberdeen, in Grays Harbor county, its principal headquarters for its logging operations were, at the time in question, at the village of Brooklyn, in Pacific county, a short distance south of the common boundary of those counties. The village is composed largely of the logging company's plant, which consists of its roundhouse, its machine shop, its office, its store, a considerable number of its cottages occupied by its employees, and its railway yards for the accommodation of its large number of railway cars, its several steam locomotives and its several gasoline railway motors. There are also some residences in private ownership. There is a postoffice near the northeasterly edge of the village.

The crossing where the accident occurred is a short distance easterly from the village. It is plainly a country crossing, not a town crossing. The nearest houses are some three hundred feet distant from the crossing. The postoffice and a store are about one-quarter of a mile north of the crossing on the same county road. The roundhouse, shops and office of the company are about one-quarter of a mile westerly from

the crossing. Haaga occupied as his living quarters a cottage about one-quarter of a mile westerly from the crossing, a short distance from the office. Hubbard lived in his own house situated a little more than one-quarter of a mile southwesterly from the crossing near the same county road.

The railway track crossing the road is the company's main line track leading from the roundhouse, office and yards easterly out into the woods, where the logging operations are carried on at different localities. Close to the county road on its westerly side and some 130 feet southerly from the crossing, there rises a steep bluff obstructing the view westerly along the main line track and a spur ending near the west side of the road some thirty-eight feet south of the crossing. The road runs slightly west of south from the crossing to the bluff. It there turns more to the west around the bluff, continuing beyond Hubbard's house. The road is improved by a well gravelled surface eighteen feet wide. The railway is of the usual construction of standard railways.

The motor in question, called by some of the witnesses a speeder, consists of a short railway flat car some twenty-five feet long, mounted on four ordinary railway car wheels, propelled by a ninety horse-power gasoline engine mounted on one end of the platform, with a small cab immediately back of the engine. It has an automatic coupler on each end. It has a whistle capable of being heard a long distance; witnesses testifying that, under favorable conditions, the whistle could be heard a distance of several miles. It has two headlights, each of the usual automobile headlight type, one on the front of the top of the cab casting its rays forward, and the other on the rear of the top of the cab casting its rays to the rear. It weighs nine tons without any load. It is used to haul men and supplies

between the company's headquarters and the logging operations out along its main and branch line tracks, and in switching cars in the yards. It is capable of moving efficiently six ordinary railway cars at one time.

At the time Haaga was injured, he had been employed by the logging company for a period of a year or more as head chainman of its surveying crew. Hubbard, a surveyor, was then working for the logging company as a member of the same crew.

During the morning of the day in question, Hubbard walked from his home along the county road to the crossing and along the track to meet Haaga at headquarters, arriving there at about seven o'clock. They then, with another member of the surveying crew, went in Haaga's automobile a distance of some two or three miles out into the woods, where Haaga parked his car near a road. They then commenced surveying near there, working towards headquarters. When they had completed their day's work at between four and five o'clock, they were but a short distance from headquarters.

They then walked to headquarters, leaving Haaga's car where it had been parked. Haaga then went to his living quarters and changed his clothes. He then went with Hubbard to his home as a guest of Hubbard; this, in any event, wholly outside the course of the employment of either of them. They walked easterly along the railway track to the crossing, and thence along the county road to Hubbard's home. As they passed the crossing, each of them remembered, though not very certainly, seeing cars standing on the spur west of the road and south of the main track. Cars so standing there would somewhat obstruct the view to the west, along the main track, of one approaching the crossing along the road from the south. They visited

together at Hubbard's home, having dinner in the meantime, until about half past six o'clock, or possibly a little later. Mrs. Hubbard then asked Hubbard to go to the store and postoffice on a family errand. Hubbard, intending to go in his Chevrolet sedan, offered to take Haaga along, so he could at least ride a part of his way back to his living quarters.

Twilight had then been passed, almost into the full darkness of the night. Hubbard turned on the lights of his automobile, and, with Haaga sitting to his right in the front seat, drove along the road around the bluff to the crossing at a speed at no time of over fifteen to twenty miles per hour and, as he says, slowing up at the crossing. He says upon approaching the crossing he looked in both directions along the track and did not see anything approaching thereon. He says he did not hear any whistle or bell, and did not see any light indicating the presence of any moving object along the track.

Haaga, sitting on the right, said he looked to the right, that is, to the east, along the track, his view being in that direction unobstructed for a distance of several hundred feet. While he says he glanced to the left, evidently he did so only casually, depending upon Hubbard to look out for possible danger from that direction. He says he did not hear any whistle or see any light or reflection thereof upon the track, indicating the presence of any moving object along the track.

The automobile was struck, while on the crossing, by the motor approaching from the west. The motor was run up to or near the crossing at a speed of fifteen to twenty miles per hour, though its speed was evidently checked before coming in contact with the automobile upon the crossing. The front of the automobile passed the front corner of the platform of the motor and struck its automatic coupler. At almost the same

instant the platform of the motor struck the side of the automobile. The motor was derailed, but did not upset. It pushed the automobile easterly a short distance off the crossing and the road. Haaga was thereby injured.

A Mrs. Downing, living in a cottage about three hundred feet westerly from the crossing and about twenty feet north of the track, testified that she was familiar with the whistle of the "speeder," and had heard it on numerous occasions; that she heard the crash at the crossing, but did not hear any whistle before the crash, though she was in her cottage when the speeder passed it and when the crash occurred at the crossing. She immediately went to the crossing to render such aid as she could to whoever might be injured.

Aubert, the motorman, testified that the headlight was burning and the whistle was blown upon the approach of the motor to the crossing. His testimony has some support from one or two other witnesses.

■ It is first contended in behalf of the logging company that Haaga is entitled to relief, if at all, only from the accident fund of our industrial insurance law, and not directly against the logging company. To successfully maintain this contention, it would have to appear that Haaga was "injured in the course of his employment." See Rem. Comp. Stat., § 7679, as reenacted and amended by Chapter 132, Laws of 1929, p. 329.

We concede, for present purposes, that Haaga's employment by the logging company was an extrahazardous employment. He was employed by the defendant at a daily wage of $5.50 per day. He had no employment duties of any nature to perform for the company other than during his working hours, which were from not earlier than seven o'clock in the morning to not

later than five o'clock in the afternoon. He was not injured during those hours. He was not doing anything for the logging company when he was injured. He was not even injured while upon the premises of the logging company. He was injured upon a public county road while returning from a social visit to the home of his friend Hubbard, while riding as a guest of Hubbard in Hubbard's automobile.

We are of the opinion that Haaga was not "injured in the course of his employment." Our decisions in *Brown v. Department of Labor and Industries*, 135 Wash. 327, 237 Pac. 733, and *Hama Hama Logging Co. v. Department of Labor & Industries*, 157 Wash. 96, 288 Pac. 655, are decisive to this effect.

It is contended in behalf of the logging company that Haaga was guilty of such negligence contributing to his injuries that the trial court should have withdrawn the cause from the consideration of the jury and decided, as a matter of law, that he is not entitled to any recovery in this action; appropriate, timely motions having been made in that behalf. This contention, as we understand counsel, is rested upon the theory that Hubbard's negligence became a contributing, proximate cause of the accident by his failure to take notice of the approach of the motor to the crossing; that Haaga's negligence also became a contributing, proximate cause of the accident by his failure to take notice of the approach of the motor to the crossing and timely warn Hubbard thereof; and that thus, in a sense, Hubbard's negligence became imputable to Haaga and became Haaga's negligence.

Since Haaga was only an invited guest of Hubbard in riding from the Hubbard home to the crossing, with no authoritative control whatever over the operation of Hubbard's automobile, it is not enough to absolve the logging company from liability to Haaga that Hub-

bard's negligence be established as a contributing, proximate cause of the accident. Our real concern here is the alleged negligence of Haaga as a contributing, proximate cause of the accident.

■ Now, wherein did Haaga fail to do what the law required of him as a reasonable man under the circumstances existing upon the approach to the crossing of the automobile in which he was riding as a guest of Hubbard? The evidence, it seems to us, warranted the jury in drawing these conclusions of fact:

(1) The automobile at no time was being driven between the Hubbard home and the crossing in excess of twenty miles per hour, and in all probability during a considerable part of that time was driven not to exceed fifteen miles per hour. (2) The speed of the automobile was slowed down just before going upon the crossing, probably to fifteen miles or less per hour. (3) Haaga, as the crossing was approached, sitting on the right, looked to the right, having a clear view along the track for a distance of several hundred feet. He also glanced to the left, where his vision was somewhat obscured because of Hubbard sitting to his left, and possibly because of cars standing upon the spur track; this evidently being but a casual glance by Haaga, he assuming that Hubbard would look and take sufficient notice of the possible approach of a motor or locomotive along the track from that direction. (4) Haaga did not see any headlight along the track to the west, this possibly because he did not very carefully look in that direction, nor did he see the reflection of any such headlight along the track to the crossing. (5) Haaga did not hear any bell or whistle indicating the approach of any motor or locomotive along the track from the west. (6) Haaga did not, as a mere guest of Hubbard, have any authoritative control over the driving of Hubbard's automobile.

We think it should not be held, as a matter of law, that Haaga failed to do all that he, as a reasonably prudent man, in his then position, would have done in looking out for danger likely to be then present at the crossing. So, even were we to assume that Hubbard was in some degree negligent in the manner of driving his automobile in approaching the crossing and in failing to make careful observation of the possible approach of a motor or locomotive from the west, the side on which he was sitting, his negligence was not so apparent to Haaga as to lead Haaga to assume that he should take notice and make observation of the surroundings to any greater extent than he did. Indeed, we are unable to see in the evidence any outward sign of negligence on the part of Hubbard that would be likely to lead Haaga to notice that Hubbard was in any degree negligent.

Counsel for the logging company rely upon the following of our decisions: *Cable v. Spokane & Inland Empire R. Co.,* 50 Wash. 619, 97 Pac. 744, 23 L. R. A. (N. S.) 1224; *Hoyle v. Northern Pac. R. Co.,* 105 Wash. 652, 178 Pac. 810; *Sadler v. Northern Pac. R. Co.,* 118 Wash. 121, 203 Pac. 10; *Le Doux v. Alert Transfer & Storage Co.,* 145 Wash. 115, 259 Pac. 24. There is, we think, in each of those cases an element not present here. They involve either some degree of authoritative control in the injured person over the driving of the automobile or vehicle; or some special knowledge of the injured person of the impending danger, apart from the knowledge of the driver; or such manifest negligence on the part of the driver as obligated the injured person to take notice of such negligence.

The rule in general terms applicable to the situation in which we find Haaga in this case, was well expressed by Judge Gose in *Wilson v. Puget Sound Elec. R.,* 52 Wash. 522, 101 Pac. 50, 132 Am. St. 1044, quoting with

approval from the language used in *Cable v. Spokane & Inland Empire R. Co.*, 50 Wash. 619, 97 Pac. 744, 23 L. R. A. (N. S.) 1224, as follows:

"Ordinarily where one rides in a vehicle with the driver thereof and is injured by the negligence of a third person, to which negligence that of the driver contributes, this contributory negligence is not imputable to the passenger, unless said passenger has, or is in a position to have and exercise, some control over the driver with reference to the matter wherein he was negligent."

This language was again quoted with approval by Judge Ellis, speaking for the court, in *Beach v. Seattle,* 85 Wash. 379, 148 Pac. 39. The following of our later decisions are in full harmony with this general statement of the law: *Allen v. Walla Walla Valley R. Co.,* 96 Wash. 397, 165 Pac. 99; *Dodge v. Salinger,* 126 Wash. 237, 217 Pac. 1014; *Neagle v. Tacoma,* 127 Wash. 528, 221 Pac. 588; *Gillum v. Pacific Coast Railroad Co.,* 152 Wash. 657, 279 Pac. 114; *Reamer v. Griffiths,* 158 Wash. 665, 291 Pac. 714; *Sanderson v. Hartford Eastern R. Co.,* 159 Wash. 472, 294 Pac. 241.

Our decision in *Bauer v. Tougaw,* 128 Wash. 654, 224 Pac. 20, supports the view that, to render the guest guilty of contributory negligence, he must have some special knowledge suggesting to him the impending danger, apart from the knowledge of the driver; or some reasonable cause to take notice of some manifest negligence on the part of the driver in failing to take notice of the impending danger.

■ It is contended in behalf of the logging company that the trial court erred to its prejudice in giving to the jury its instruction No. 7, as follows:

"You are instructed that the defendant, Saginaw Logging Company, has a right to operate its speeders over and across the road at the time and place mentioned in this case. It is the duty of the driver of the

speeder to sound the whistle, upon such speeder, at least eighty rods from the place where the tracks upon which said speeder was being operated across the highway and to continue to sound such whistle until the speeder was across the highway, and if you find by a preponderance of the evidence that the whistle of the speeder as it approached the crossing in question was sounded, then the defendant would not be guilty of negligence. If on the other hand you find it was not so sounded and no other warning of the approach of the speeder to the crossing was given, sufficient to warn a careful and prudent person, then the defendant would be guilty of negligence.''

This instruction is based upon the law embodied in Rem. Comp. Stat., § 2528, reading as follows:

''Every engineer driving a locomotive on any railway who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded at least eighty rods from any place where such railway crosses a traveled road or street on the same level (except in cities), or to continue the ringing of such bell or sounding of such whistle until such locomotive shall have crossed such road or street, shall be guilty of misdemeanor.''

It is argued that this statute does not have application to a gasoline railway motor such as is here in question. This same argument was advanced in *Sanderson v. Hartford Eastern R. Co.*, 159 Wash. 472, 294 Pac. 241, with reference to a gasoline railway motor, apparently no larger, of no greater weight, of no greater capacity, or of no greater power than this motor. We held in that case that the above quoted statute was applicable to the operation of such a gasoline railway motor. We adhere to that holding.

It is contended in behalf of the logging company that the trial court erred to its prejudice in giving to the jury its instruction No. 8, as follows:

''One operating a train or a speeder at a railroad crossing, such as the defendant, Aubert, was operat-

ing, *must give the warning required as heretofore instructed in Instruction No. 7, and if he does,* he has a right to assume, until the contrary becomes evident, that one approaching the tracks in an automobile will give the speeder the right of way, and the operator of the speeder is not required to attempt to bring the speeder to a standstill because the automobile may be seen to be approaching the track; but has the right to assume, until the contrary appears, that the occupants of such automobile will use reasonable care for their protection, and will give the speeder the right of way to which it is entitled under the law; and that one in charge of such a speeder is not to limit or stop his speeder until it is apparent that those in the automobile about to cross the tracks are not aware of its approach or do not intend to give it the right-of-way.''

We italicize the portion of which complaint is particularly made.

This instruction, apart from the italicized portion, is exactly as requested by counsel for the logging company. The objection to the italicized portion seems to us to be sufficiently answered by what we have said with reference to instruction No. 7, above quoted, given by the court.

It is somewhat difficult to follow counsel's further argument directed against this instruction No. 8. It seems to be that, by the court's inserting therein the above italicized portion thereof, it has the effect of advising the jury that, in the absence of the statutory required whistle or bell warning, the engineer or motorman cannot indulge in any presumption as to what the action of the driver of the automobile may be at the crossing. We think this argument is not sound, especially in view of instruction No. 17, given by the court to the jury, which reads as follows:

''A traveller upon a public highway approaching a railway crossing such as the one in question cannot impose upon the company operating the railway all the

caution needed to prevent accidents. With knowledge that the company operating the railway has the right of way and cannot readily stop its trains, locomotives or speeder, the well settled rule imposes upon the traveller to use all means a reasonably prudent person would, under the existing circumstances, to avoid a collision. If you find that there were box or gondola cars on the southerly side of the crossing, and if you further find that the view of the said plaintiff towards the left was obstructed by such gondola or box cars until the siding had been passed, then the caution required of the plaintiff was in exact proportion to the danger.''

We see no prejudicial error in these instructions.

■ It is contended in behalf of the logging company that the trial court erroneously limited its counsel's cross-examination of Haaga as a witness. The particular questions so asked, to which objection was made and the objection sustained, are as follows:

''Q. To refresh your recollection, I will ask you if, during his [Kent's] visit to you at the hospital, you and he present, you stated to him, that, at the time of the injury, you were really on duty for the Saginaw Logging Company? And that you were having Hubbard take you out to the woods where your car was left that morning to get your car and bring it in, and that you considered that was part of your employment for the logging company?''

Viewed as preliminary, impeaching questions, as seems to have been one purpose in asking them, we do not see any prejudicial error in the ruling of the trial court in sustaining the objections to them. Affirmative answers would not have negatived anything to which Haaga testified upon his direct examination. Viewed as an attempt to prove by Haaga's testimony that he was injured in the course of his employment, as seems to have been another purpose of the inquiry, we do not see any prejudicial error in the ruling of the

trial court sustaining the objections to them. Affirmative answers would not have negatived the conclusively proven fact that Haaga was not injured in the course of his employment. This, we think, is made plain by what we have already said touching that question.

█ It is finally contended in behalf of the logging company that the award of forty thousand dollars to Haaga for his injuries is excessive to the extent of evidencing passion and prejudice in his favor on the part of the jury. At the time Haaga was injured, he was a vigorous, healthy young man, not quite twenty-one years old. He was then earning $5.50 per day, and employed almost continuously. So, it is fair to assume that he was earning approximately $130 per month. It seems probable that his earning power would increase in the future. He then had a life expectancy of forty-one years. According to the testimony of an experienced life insurance witness, a life annuity of $10 per month would have cost Haaga $2,485.98, and a larger monthly life annuity would have cost him in the same proportion. So, a life annuity of $130 per month would have cost Haaga approximately $32,000. If his earning power is practically entirely, permanently destroyed by his injuries, this would seem to be a fair estimate which the jury would be entitled to place upon the value of the loss of his earning power alone. Dr. Watkins, who was Haaga's principal attending physician following his injuries, testified, touching the nature and extent thereof, as follows:

"I attended Haaga. He had an injury to his neck and some other injuries. He had a dislocation of the sixth cervical vertebra and we reduced it. There was a fracture of the seventh cervical vertebra. The dislocation of the sixth cervical vertebra was forward. The dislocation was reduced and he was put in a splint. By reducing the dislocation, I mean the bones were

put back into position, and the splint is a harness fitted around his neck, and the purpose of it is to keep the head from going forward. He was kept in that condition quite some time. He has a dislocation of the sixth cervical vertebra at the present time [one year after Haaga was injured]. I know of nothing very much that can be done to change or remedy his condition. An operative procedure might be had. A complete ankylosis might be performed, which is a procedure intended to make the bones unite so that they will not move. There is danger of damaging the cord by such an operation. If the cord is damaged, it cannot be repaired. It is a real and serious danger. I advise against such an operation. If pressure on the cord becomes evident, then an operation should be incurred.''

Dr. Running, who had made examination of Haaga's injuries, though not quite so familiar with them as Dr. Watkins, testified:

''I believe that the cardiac heart symptoms that he [Haaga] has are due to pressure on the spinal cord. I think these pressure symptoms are a matter of real concern. I do not know whether they will get worse or not. I do not think they will improve.''

Haaga testified, touching his injuries, in part as follows:

''I was in the hospital 75 days. I was instructed to wear the brace every day, after I went home. I take it off when I go to bed nights, and put it on again when I get up in the morning. I did that for three or four months, and then Dr. Watkins said I did not have to wear it every day. If I walk around too much it tires me. I have not done anything since the accident. I cannot even chop wood. I wear the brace in the morning, and then when I am pretty well rested I go out and walk around and get a little fresh air. My neck bothers me more than anything else, but my left arm bothers me also, because my left shoulder blade is cracked. It was so painful for two weeks I could not move it. It has recovered somewhat, but it is weaker than the other, and an inch and a half smaller.''

Haaga's mother, with whom he lives, testified, touching his injuries, as follows:

"After he got out of the hospital, he was living at my home. He cannot do any work. Part of the day in the mornings he wears the brace around his head. He has periods when he has lost consciousness. He would get over it in four or five minutes, then he feels badly for a couple of hours. He was quite a little better since he came out of the hospital, but for the last five months I never saw any difference in him. He does not wear the brace all the time, but part of the day."

In view of Haaga's loss of earning power, his suffering since the accident, his certain future suffering and inconvenience in the manner of his living in the future, and the general impairment of his prospects in life, as the jury had the right under the evidence to view his afflictions as the result of his injuries, we do not feel warranted in disturbing the award of the verdict upon the ground of it being excessive; that is, we cannot decide that it was the result of passion or prejudice on the part of the jury.

We have painstakingly reviewed this voluminous record, and are satisfied that it does not disclose any prejudicial error evidencing a failure of the logging company to have a fair trial.

The judgment is affirmed.

MITCHELL, BEELER, and HERMAN, JJ., concur.

TOLMAN, C. J. (dissenting)—In my opinion, the verdict is excessive by at least fifty per cent, and respondent should be given the opportunity to elect between accepting a judgment for twenty thousand dollars or submitting to a new trial; either that, or this court should direct a new trial because of the excessive verdict.