[No. 29690. *En Banc.* February 8, 1946.]

FRED SCHULTZ, *Respondent*, v. KING COUNTY MEDICAL SERVICE CORPORATION, *Appellant.*[1]

*Riddell & Riddell,* for appellant.

*Wright & Wright,* for respondent.

SIMPSON, J.—Action was instituted in this case to collect for various items of expense incurred by plaintiff as a result of an operation performed by Dr. C. E. Hagyard, a member of defendant corporation.

The complaint alleged that the principal business of defendant was that of making contracts with various employers, whereby the corporation, for a consideration paid monthly by individual employees, agreed to furnish to such employees all reasonable surgical services for an operation or any accidental bodily injury for a period not to exceed twenty-six weeks and for the treatment of any disease or

[1] Reported in 165 P. (2d) 857.

any sickness for a period of twenty-six weeks; that plaintiff was an employee of the Seattle-Tacoma Shipbuilding Corporation, who had paid his fees and was entitled to the services of defendant. It is further alleged that on September 24, 1943, plaintiff became ill and was taken to the Providence hospital, in the city of Seattle, for treatment of an ailment "not excluded by the terms of the contract" and that Dr. Hagyard performed an operation on plaintiff. The complaint also charged that defendant corporation refused to pay the doctor and hospital charges incurred by the reason of plaintiff's operation, and the plaintiff was compelled to pay them.

In its answer, defendant admitted that it had entered into contracts as alleged by plaintiff, but denied liability for expenses incurred by the plaintiff. Defendant then set up an affirmative defense, in which it was alleged that on August 25, 1942, plaintiff had an acute attack of stomach ulcers, which necessitated his treatment and hospitalization. He was treated by Dr. C. E. Hagyard, whose charges and those of the hospital were paid by defendant. September 24, 1943, plaintiff suffered another attack of the same disease and was again cared for by Dr. Hagyard. The defendant concluded that it was not obliged to pay for the last operation and therefore refused to make payment. The reply put in issue the allegations contained in defendant's affirmative defense.

The cause, tried to a jury, resulted in a verdict in favor of plaintiff. After denying a motion for judgment n. o. v. or for a new trial, the court entered judgment on the verdict. Defendant then appealed to this court.

Its assignments of error, nineteen in number, relate to claimed errors on the part of the court in denying appellant's motion for dismissal, entering judgment on the verdict, and in denying the motion for judgment n. o. v. or for a new trial.

The facts most favorable to respondent may be summarized as follows: Appellant corporation was organized some years ago by a large number of physicians and surgeons in the city of Seattle. Appellant entered into con-

tracts with various employer organizations, of which Seattle-Tacoma Shipbuilding Corporation was one. The pertinent portions of the contract are as follows:

"IN CONSIDERATION of the compensation hereinafter provided, and upon compliance with the stipulations hereinafter contained, KING COUNTY MEDICAL SERVICE CORPORATION, a charitable corporation, having its principal place of business at Seattle, Washington, and hereinafter described as the 'Company,' hereby offers to those employees, not over 65 years of age, of SEATTLE-TACOMA SHIPBUILDING CORPORATION, a group, having its place of business in the state of Washington, at Seattle, hereinafter called the 'Employer,' the special contracts with their privileges and benefits, which privileges and benefits are hereto attached and enumerated as exhibits 'A' to 'D' inclusive, and hereby offers the enjoyment of the privileges and benefits which are offered in said contracts, subject always to the following terms and conditions, towit:

"IT IS AGREED and understood that the company is acting as the agent of said employer and of his said employees, which employees are hereinafter referred to as 'Patient,' in securing the propositions which are contained in the riders attached hereto and marked 'A' to 'D' inclusive, that said propositions are contingent offers which become contracts upon their acceptance by the employer and the continued compliance by said employer and by said employees with the conditions herein stipulated, and that acceptance thereof by the employer and by his said employees shall at all times be evidenced only by the payment to the company of the compensation hereinafter provided and the delivery of this agreement to said employer, and also by written notice to the company that such employee has in writing accepted this agreement. . . .

"7. The amounts to be paid by the employer as herein specified are accepted by the individuals, firms and corporations offering their services as full payment and compensation and they and each of them agree to perform the same without other, further, or additional charge of any kind whatsoever to the employees of said employer.

"8. The medical director of the company, who is hereinafter referred to as the 'medical director,' or any physician whom he may designate, shall have the exclusive and absolute right to determine whether any patient is entitled to treatment, and if so, to what treatment, and any such determination made in good faith shall be deemed and held to be

conclusive and binding upon the company, the patient, his heirs, executors, administrators and dependents and upon the employer if the employer be interested, and upon those offering said services. . . .

"10. The services which are hereby offered are subject to the limitations specified in the riders hereto attached and in no event shall any such service be furnished outside King County, Washington, except upon the written approval of the medical director previously given, nor shall any such service be furnished for care of any injury sustained while in the course of employment.

"11. In consideration of the agreement hereinbefore set forth to be performed by the persons on whose behalf the company is offering said services, the employer agrees that he will pay to the King County Medical Service Corporation on or before the 15th day of each and every month hereafter while this agreement shall remain in effect, according to the following schedule:

"$1.75 per month for each employee authorizing such deduction employed during the preceding pay-roll period, which amount the employer hereby agrees to deduct from the pay of each employee authorizing such deduction on the first day of each such period of employment. All monies so collected by said employer shall be kept by it separate and apart from its own funds and shall constitute a trust fund, title to which shall at all times vest in The Company and not in The Employer.

"12. The patient shall be entitled to receive all of said services which commence during the period for which he has paid, or had deducted from his wages the amount due from him for such period, irrespective of his continued service for the employer, if, however, he shall remain in King County."

The contents of exhibit A provided in part:

"SERVICES. (a) All surgical services reasonably required for any operation and/or for any accidental bodily injury to the patient for a period not to exceed Twenty-six (26) weeks.

"(b) All medical services reasonably required for the treatment of any disease and/or any sickness and/or any accidental bodily injury to the patient for a period of not to exceed Twenty-six (26) weeks. . . .

"(d) Dental examinations and X-rays will be furnished where necessary in medical diagnosis.

"(e) X-rays in all cases of suspected fracture and in other conditions upon authorization of the Medical Director. . . .

"TERMS, LIMITATIONS AND EXCLUSIONS. The physician shall not be required to treat: . . .

"3. Any pre-existing sickness, injury or physical disability whether patent or latent and their complications and sequaellae from which the patient may be suffering, or which may originate or exist prior to the commencement of his relationship with the company and the medical director or a physician whom he may designate shall in line with the authority conferred upon him in paragraph 8 of the agreement, have the exclusive and absolute right to determine the question whether or not any such condition originated or existed prior to the commencement of the relationship between the patient and the company, and further, that any such determination made in good faith shall be deemed and held to be conclusive and binding upon the patient, his heirs, executors, administrators and dependents and upon his employer, if any there be interested, and upon the company, and upon the physician; . . .

"EXHIBIT B. Hospitals. The hospitals, the names of which appear upon a list delivered by King County Medical Service Corporation, which is hereinafter referred to as 'Company,' to SEATTLE-TACOMA SHIPBUILDING CORPORATION, the employer, on behalf of its employees, which delivery is being made at the time of the execution of the attached agreement, hereby agree, each for itself and not one for the other, that they and each of them will for a period of not to exceed Twenty-six (26) weeks, furnish to the patients described in the attached agreement, such hospital and nursing services (special nursing service not to exceed 4 weeks) as may be reasonably required and authorized by the medical director of the Company in the treatment of any injury or sickness which is covered by the service of the members of the King County Medical Service Bureau under the attached agreement.

"The delivery of this contract and the continuing compliance with the stipulations required by the company in the contract hereto attached and made a part hereof shall constitute an acceptance of this offer by said employer and patients, the sufficiency of the consideration therefor being admitted."

Respondent was an employee of Seattle-Tacoma Shipbuilding Corporation and, as such, took advantage of the

contract and paid the amounts provided therein, as entered into between his employer and appellant. He became a contributor in 1942. At about eleven p. m., August 23, 1942, respondent became violently ill. Dr. Hagyard, a member of appellant organization, was called and determined that an operation should be performed at once. An ambulance was called and respondent was rushed to the hospital, where Dr. Hagyard operated and found a perforation of the bowels. The doctor testified:

"Q. Did you find a perforation? A. Yes, on the operation. Q. What did you do to correct the matter at the time? A. I used the customary method that is recognized by all surgeons, do the least amount of surgery possible under the existing conditions, which means a beginning peritonitis. Q. You mean for temporary relief? A. Closed the opening and treated his peritonitis. Q. For temporary relief? A. For complete cure for the condition for which I operated, which was a perforation. Q. (Mr. Wright) What did you do? A. I closed the opening in his bowel. Q. How did you close it? A. By suturing, covering it over with layers of fat. Q. You took some fat off his stomach? A. Yes. Q. And put that over the perforation? A. Yes. Q. You didn't dissect any diseased portion of his stomach? A. No. Q. His condition wouldn't command that at that time? A. It is not good surgery. Q. No. That putting the piece of fat over the perforated hole, of course, closed the hole so that the food and fecal matter wouldn't go out into the cavity? A. That is right. Q. That is what is known in surgery as a major operation, isn't it? A. Yes, it is. Q. You found conditions there that told you that that would not be a cure, didn't you? A. I found he had an ulcer, and this perforation was right in the center of a hard mass which certainly was the ulcer. Q. You didn't take the ulcer out? A. No. Q. His condition wouldn't permit that, would it? A. No. Q. And, of course, you knew that until that ulcer was taken out, there couldn't be any cure? A. No, I didn't know that. Q. (Mr. Wright) You had some reason to believe that, anyway, didn't you? A. Eventually ulcers are sometimes cured by medical means. Q. Not very often, though? A. That depends on the ulcer and the state and person and many other conditions. . . . Q. (Mr. Wright) Did you tell him he would have to be operated on to get rid of this ulcer? A. No, not at that time. Q. You didn't at that time? A. No. Q. How quickly afterward did you? A. I

may have discussed it, the possibility of that medical treatment and surgery, and if medical treatment failed, surgical treatment would be necessary. Q. Did you tell him a few days after he was operated on that this was only a temporary operation and that you would have to wait until he got better and complete the operation? A. I told him— Q. Did you or did you not? A. He still had an ulcer. Q. What? A. I told him that he still had the ulcer; that he'd need treatment which might respond to medical care and which would be well worth trying. Q. That would be a pure guess and a gamble, wouldn't it? A. That is what is usually done. We don't operate on every ulcer that walks in. Q. Did you tell him, now then, that you would have to—that when he got stronger that you would have to take out this ulcer and complete the operation? A. No."

At another time he testified: "I exercised my best judgment and tried over a considerable length of time to get results by medical means."

Respondent recovered from the operation and after an elapse of about five weeks returned to work. Thereafter he was subject to much pain and discomfort and on frequent occasions consulted Dr. Hagyard, who prescribed for him as stated by respondent. Respondent testified as follows:

"Well, he put me on a diet to just eat—be careful what I ate and told me to drink lots of milk whenever it was bothering me. He says, 'Drink milk.' So I had to take this milk with me at work, and when it bothered me I'd go down and take a glass of milk. Q. How long would that last? A. I'd say about an hour and a half. Q. Then you had the pains again? A. Then it started bothering me again. Q. Then did you report that to him? A. Yes, I told him. Q. That went along right along after you went to work? A. Yes. Q. How long was it— You say he told you he'd have to perform the other operation after you had your first operation. How long was it after that that he told you that the first time? How long after the first operation? A. Well— Q. Were you still in the hospital yet or not? A. Yes, I was still in the hospital. Q. Did he tell you that after you got out of the hospital? A. Yes, he told me that."

September 24, 1943, Dr. Hagyard performed another operation on respondent and at that time removed a stomach

ulcer. Appellant paid all expenses of the first, but refused to pay for the second operation. It is the expenses last incurred that brought about the institution of this action. The question presented was whether the appellant corporation, under its contract, was bound to pay the expenses of the last operation.

Respondent argues that Dr. Hagyard and appellant purposely

" . . . attempted to avoid any liability for considerable expense by putting the respondent off, week after week, and not performing the operation which was necessary to effect a cure, putting him off until twenty-six weeks had expired."

We have made a careful study of the statement of facts, but cannot find any evidence to support respondent's contention. At one time during the trial, respondent was asked how long it was after the operation before he was ready to have the second operation performed. The trial court sustained an objection made by appellant on the ground that the question could only be answered by medical men. We are compelled to hold that there was no evidence, nor inference from the evidence, to substantiate respondent's contention to which we have just referred.

Neither the jury nor the members of this court are able to determine the proper treatment of respondent's ulcer. The doctor attempted for over a year to cure respondent, but finally had to perform the operation. We cannot determine in the absence of medical evidence, and there was none, that the operation should have been performed within the period mentioned in the contract.

Appellant argues that under its contract it was not compelled to pay for treatment of a disease for a period longer than twenty-six weeks; that the ulcer was a preexisting sickness, for the treatment of which it was not liable. This contention is founded upon provisions of paragraph three of the rider to the contract, known as exhibit A, which we set out in this opinion.

We must decide this case in favor of appellant for the reason that the ulcer from which respondent suffered was a preexisting disease for the treatment of which appellant

was not liable under its contract. The evidence relative to whether the ulcer was a condition preexisting the commencement of respondent's relationship with appellant, was that given by Dr. Hagyard, who testified: "It was a chronic ulcer, a lot of scar tissue. It evidenced it had been present for several years." Several years antedated respondent's connection with appellant corporation. This is clearly apparent when we call to mind respondent's testimony that he started to pay contributions in 1942, the very year he was operated upon the first time.

Medical testimony showed that many people have ulcers of the stomach and never have any trouble or pain to indicate that they have the condition, which at a later date becomes acute.

We conclude, after a study of the contract and the evidence introduced at the trial, that there was no evidence or inference from evidence which justified the court in submitting the case to the jury. On the other hand, the evidence showed that appellant had complied with its agreement contained in the contract.

Judgment is reversed, with instructions to dismiss the action.

DRIVER, C. J., BEALS, MILLARD, STEINERT, ROBINSON, and JEFFERS, JJ., concur.

MALLERY and BLAKE, JJ., dissent.