[No. 29889. *En Banc.* December 17, 1946.]

ROSE A. McCARTY *et al., Respondents,* v. KING COUNTY MEDICAL SERVICE CORPORATION *et al., Appellants.*[1]

[1]Reported in 175 P. (2d) 653.

*Riddell, Riddell & Hemphill,* for appellant King County Medical Service Corporation.

*Nelson R. Anderson,* for appellant Seattle General Hospital.

*Caughlan & Hatten,* for respondents.

CONNELLY, J.—Plaintiffs, McCarty and wife, instituted the present action, naming as defendants King County Medical Service Corporation and Dr. Herbert C. Ostrom, as its medical director, and Seattle General hospital, a corporation.

The first cause of action set forth in plaintiffs' complaint is against the King County Medical Service Corporation and Dr. Ostrom and seeks the recovery of $442.50 which plaintiffs had personally paid for special nurses' services during Mrs. McCarty's period of hospitalization for injuries sustained by her in a fall down an elevator shaft in the Chamber of Commerce building in Seattle, where she was employed as an elevator operator.

The second cause of action seeks a declaratory judgment against Seattle General hospital absolving plaintiffs from liability for hospital service rendered by that institution to Mrs. McCarty. As to this cause of action, Seattle General hospital, by cross-complaint, sued the McCartys for the amount of the hospital bill in question, which was agreed to be in the reasonable sum of $688.20, regardless of where liability therefor might ultimately attach.

For the sake of brevity and convenience, the King County Medical Service Corporation will hereinafter be referred to as the service corporation.

In the first cause of action against the service corporation and Dr. Ostrom, the complaint alleged that on May 1, 1941, plaintiff's employer, the Seattle Chamber of Commerce, entered into a contract with the service corporation for group medical and hospital service, by the terms of which

the Seattle Chamber of Commerce agreed to collect from each of its employees the sum of $1.75 per month and to pay the same to the service corporation as prepayment for medical, hospital, and nursing care and service; that, in consideration of such payments, the service corporation represented and warranted that special contracts existed between it and certain hospitals and doctors in King county, including defendant Seattle General hospital, whereby such institutions agreed to receive and care for, as patients, all persons who should be designated by the service corporation as participants in the prepaid group medical aid plan provided for in the medical service agreement referred to above.

The complaint alleged that the service corporation agreed that employees of the Seattle Chamber of Commerce who might sustain accidental injuries outside of their actual employment would receive care and treatment and that the bills therefor would be paid by the service corporation; that this included medical expense, doctors' fees, nursing care, and hospital charges. The complaint further alleged that plaintiff Rose McCarty, as an employee of the Seattle Chamber of Commerce, is a beneficiary under the group medical aid plan and entitled to all of its benefits; that on October 12, 1942, she sustained accidental injuries, not in the course of her employment, requiring her removal to the Seattle General hospital and her treatment in the hospital until January 9, 1943; that proper treatment of her injuries and accompanying illness required the employment of three special nurses, and that expense therefor was incurred in the reasonable value of $442.50, and for hospital services in the reasonable value of $688.20.

It is also alleged that the service corporation and its medical director refused to designate plaintiff Rose McCarty as a person entitled to the benefits under the existing agreements and to certify plaintiff to the Seattle General hospital as a member of, and one entitled to participate in, the service corporation's prepaid group medical aid plan; that plaintiff was compelled to pay special nurses the sum of $442.50 and had sustained, by reason of such payment,

damages in that amount which she seeks to recover from the service corporation.

As a second cause of action against the Seattle General hospital, after setting forth the factual background heretofore outlined herein, plaintiffs alleged that the Seattle General hospital intended to commence suit against plaintiffs for its hospital bill in the sum of $688.20; that the said hospital services were performed pursuant to the terms of the contract between the Seattle Chamber of Commerce and the service corporation, and between the latter and the Seattle General hospital, whereby the hospital was required to accept and treat plaintiff as a patient, and that plaintiffs were protected under the terms of those contracts from liability for such hospital expense.

The defendants service corporation and Dr. Ostrom in part admitted and in part denied plaintiffs' allegations as set forth in the first cause of action and, by affirmative defense, alleged that, by the terms of the contract between Seattle Chamber of Commerce and the service corporation, the Seattle General hospital became obligated to furnish to members of the service corporation group employed by the Seattle Chamber of Commerce such hospital and nursing services as might be authorized by the medical director of the service corporation, and that the medical director, Dr. Ostrom, in good faith, had determined that plaintiff was not entitled to treatment for her injuries; that the plaintiff, Mrs. McCarty, was informed of the decision of the medical director while she was under treatment by one Dr. Smith, who had been employed by her; and that, after notice of nonresponsibility by Dr. Ostrom, acting for the service corporation, she continued to employ Dr. Smith, on her personal volition, and authorized him to procure hospitalization for her, and that she received and accepted said hospital services as a private patient, rather than as a member of the participating group.

Defendants particularly alleged that, at the time of the injury, plaintiff was an employee of the Seattle Chamber of Commerce and that the injuries complained of by her were sustained *while in the course of her employment,* and

that defendant Ostrom, in good faith, had so determined. Defendant service corporation denied liability on the added ground that the contracts for medical and nursing services were entered into by the defendant service corporation *as an agent* for the several persons concerned, and that, as such agent, it assumed no responsibility of its own.

The allegations of the defendant Seattle General hospital are, in substance, the same, with a cross-complaint and prayer for judgment against the plaintiffs in the sum of $688.20, the amount of its hospital bill against Mrs. Mc-Carty. By way of stipulation, it was admitted that the expenses for special nurses were necessary and reasonable, but it was not admitted that such expenses were covered by the said agreements. It was further stipulated that, under these agreements, the reasonable hospital charges would have been $574.50, while for a private patient, not a party to the service contract, such charges were $688.20.

The case was tried to the court without a jury. Findings of fact, conclusions of law, and judgment in favor of plaintiffs were entered against the service corporation, in the sum of $442.50, on the first cause of action for nurses' care, and denying relief to defendant Seattle General hospital against plaintiffs, on the cross-complaint, for the amount of the hospital bill.

Defendants' motion for a new trial having been denied, defendants appealed, assigning numerous errors, including the denial of their motion for new trial, the entering of certain specific findings of fact and conclusions of law, and the entry of judgment in favor of plaintiffs on each cause of action.

The facts leading to respondent's injuries, treatment, and hospitalization may be summarized as follows:

On October 12, 1942, at approximately 7:30 a. m., respondent, an elevator operator in the Chamber of Commerce building at Seattle, employed on a basis of pay by the hour, entered that building with her husband, who was employed as its building superintendent, preparatory to commencing her work. Her husband was to take her in the elevator to the third floor, where she was to proceed to the

women employees' room, remove her coat and hat, prepare for work, and take over the operation of the elevator at 7:45 a. m., the agreed and designated time of commencement of her work and pay on that day. In the morning darkness, while respondent, her husband, and two other persons, were standing in the lobby of the building near the elevator shaft, her husband opened the door of the elevator shaft. The elevator car was not at the lobby level, but respondent, believing it to be there, stepped forward and fell about six feet to the bottom of the shaft, sustaining serious injuries which form the basis of the controversy herein.

Medical treatment for her injuries was rendered by Dr. Edmund Smith, and hospitalization, as indicated, was furnished by appellant Seattle General hospital. Special nurses were employed by the respondents. Dr. Smith at first assumed that respondent was covered by the workmen's compensation act, but later was notified by the department of labor and industries that she did not come within its terms. Elevator operators in office buildings must elect to place themselves under the act. Rose McCarty had not so elected. It is not contended, therefore, by any of the parties that her injury was covered by the act.

Dr. Smith then assumed, from information given to him by respondent and her husband, that she was covered by the service corporation contract, but, at some time during the period of his treatment, was orally informed by Dr. Ostrom that the service corporation had refused to assume liability for respondent's bills. Dr. Smith, however, continued to treat her. Frank W. Fells, the business manager of Seattle General hospital, testified that the service corporation was notified that respondent was in the hospital. He further testified as follows:

"Q. While she was present at the hospital did King County Medical Service Corporation notify you concerning whether they would accept liability for her treatment? A. Not in any formal way. Q. Did they in any informal way or other way? A. If I may make a statement, the case was pushed around, as it were, between the King County Medical Service Bureau, the State Department of Labor and

Industry, and a private insurance company. And it never had been decided as long as the patient was in the hospital, who finally would assume the liability. Q. When were you first notified to the best of your knowledge and recollection by the King County Medical Service Corporation that they were not assuming liability? A. I couldn't answer that, Mr. Caughlan. Q. Well, do you recall as to whether it was prior to the patient's discharge from the hospital or after that time? A. I could only draw a conclusion. I can't say definitely there is nothing. Q. Just the best of your recollection. A. There is no written record of any notice. Q. There is no written record of any notice at all from the King County Medical Service Corporation? A. No, sir."

Dr. Ostrom testified that he did not send to Seattle General hospital any written notification to the effect that the service corporation did not assume liability for respondent's treatment, but that such notice was given over the telephone.

I. It is appellants' contention that Rose McCarty's action cannot prevail because of the finding by Dr. Ostrom, medical director for the service corporation, that she had been injured while in the course of her employment. This would exclude her from coverage under the service agreement which, in its applicable paragraphs, provides as follows:

"8. *The medical director of the company, who is hereinafter referred to as the 'medical director,' or any physician whom he may designate, shall have the exclusive and absolute right to determine whether any patient is entitled to treatment, and if so, to what treatment, and any such determination made in good faith shall be deemed and held to be conclusive and binding upon the company, the patient, his heirs, executors, administrators and dependents and upon the employer if the employer be interested, and upon those offering said services.*" (Italics ours.)

Section 10 of the same contract contains the following provision:

"The services which are hereby offered are subject to the limitations specified in the riders hereto attached and in no event shall any such service be furnished outside King County, Washington, except upon the written approval of

the medical director previously given, *nor shall any such service be furnished for care of any injury sustained while in the course of employment."*

■ Appellants claim that the service corporation's medical director, Dr. Herbert C. Ostrom, has unrestricted authority, under paragraph 8 of the medical aid contract, to determine whether or not a member's employee comes within its terms and is entitled to medical and hospital services. They contend that his decision is final. We believe that the appellant Dr. Ostrom, as the medical director of the service corporation, had no authority to determine the purely legal question of whether or not respondent's injuries were sustained during the course of her employment.

■ It appears that the contracts are prepared by the service corporation and are not read by the employees for whose benefit they are ostensibly drawn. In such situation, any ambiguity or doubtful language, under generally recognized rules of interpretation, must be resolved in favor of the employee. *Clise Inv. Co. v. Stone,* 168 Wash. 617, 13 P. (2d) 9; *Handley v. Oakley,* 10 Wn. (2d) 396, 408, 116 P. (2d) 833; *State Bank of Wilbur v. Phillips,* 11 Wn. (2d) 483, 489, 119 P. (2d) 664; *Dorsey v. Strand,* 21 Wn. (2d) 217, 222, 150 P. (2d) 702.

■ The question whether or not a person has been injured *while in the course of his employment* is a legal question which often presents serious difficulty. Considerable judicial opinion and editorial subject matter has been written in an effort to lay down an understandable rule determining whether one is, or is not, "injured in the course of employment." We believe and hold that respondent's injuries were not sustained while she was in the course of her employment as an elevator operator in the building of the Seattle Chamber of Commerce, but while she was an invitee entering the building and going to the place where she was to change her street clothes to working clothes, *preparatory to commencing her employment* as an elevator operator.

Authority to the contrary, from this and other jurisdictions, is cited by appellants, but we believe that our more recent decisions control. While appellants admit that respondent, on October 12, 1942, at 7:30 a. m., had *not yet* commenced her duties, it is their contention that she was on her employer's premises and in the preparatory stages of commencing her work and, thus, acting within the course of her employment for all practical and legal purposes. We feel that our opinions in the recent cases of *D'Amico v. Conguista*, 24 Wn. (2d) 674, 167 P. (2d) 157, *Purinton v. Department of Labor & Industries*, 25 Wn. (2d) 364, 170 P. (2d) 656, and *Mutti v. Boeing Aircraft Co.*, 25 Wn. (2d) 871, 172 P. (2d) 249, control and settle the question adversely to appellants' contention.

In the *D'Amico* case, plaintiff's decedent was employed by the Malaspino company as a workman laying a water main along a parking strip on the west side of Airport way, north of Walker street, in Seattle. He was paid by the hour and was not paid for the noon lunch period of thirty minutes. During this period, he was a free agent to go where and do whatever he might wish without consulting his employer. On the day of the accident which resulted in his death, D'Amico, after consuming his lunch during the lunch period, walked to the west curb line on Airport way where he stood watching the operation of a compressor. This was ten or fifteen feet from where he had been working and where, in a few minutes, he would resume his work. While so standing, a detached wheel from a truck owned by one Joe Conguista, not D'Amico's employer, struck him, causing injuries from which he died. His widow sued Conguista, who defended on the contention and theory that D'Amico's employer and Conguista were engaged in extrahazardous employment and paying premiums upon their employees into the accident fund of the department of labor and industries, and that D'Amico, when injured, was working in the course of his employment. In holding to the contrary, Judge Simpson, speaking for the court sitting *En Banc,* said:

"It should be said that the common-law rules, except as modified by statute, apply in determining whether the relationship of employer and employee exist. *Hubbard v. Department of Labor & Industries,* 198 Wash. 354, 88 P. (2d) 423; *Clausen v. Deparment of Labor & Industries,* 15 Wn. (2d) 62, 129 P. (2d) 777.

"This court has repeatedly held that the test of the relationship of employer and employee *is the right of control on the part of the employer over the employee.* [Citing cases.]" (Italics ours.)

The opinion places strong reliance upon our decision in *Young v. Department of Labor & Industries,* 200 Wash. 138, 93 P. (2d) 337, 123 A.L.R. 1171.

Continuing, the opinion of the court in the *D'Amico* case, *supra,* states:

"At the time of his injury, D'Amico had finished his lunch and was using his own time to gratify a curiosity or maybe learn something about the compressor. As he walked to and stood on the street corner near the compressor, he was not engaged in any duty imposed by his employer, nor was he subject to any supervision by his employer. He was not engaged in any task which had for its purpose the advancement of his employer's work. He was not being paid by his employer, nor was the company further being enriched by his connection with an extrahazardous occupation. In simple words, D'Amico at the time of his injury, and in fact during the whole noon hour, was not in the employ of the Malaspino Company.

"Other decisions of this court supporting this conclusion are: *Hoffman v. Hansen,* 118 Wash. 73, 203 Pac. 53; *Hama Hama Logging Co. v. Department of Labor & Industries,* 157 Wash. 96, 288 Pac. 655; *Haaga v. Saginaw Logging Co.,* 165 Wash. 367, 5 P. (2d) 505; *Hill v. Department of Labor & Industries,* 173 Wash. 575, 24 P. (2d) 95; *Blankenship v. Department of Labor & Industries,* 180 Wash. 108, 39 P. (2d) 981; *McGrail v. Department of Labor & Industries,* 190 Wash. 272, 67 P. (2d) 851; *Wood v. Chambers Packing Co.,* 190 Wash. 411, 68 P. (2d) 221; *Maeda v. Department of Labor & Industries,* 192 Wash. 87, 72 P. (2d) 1034; and *Waddams v. Wright,* 21 Wn. (2d) 603, 152 P. (2d) 611."

We reaffirmed this rule and lent it force in *Purinton v. Department of Labor & Industries,* 25 Wn. (2d) 364, 170 P. (2d) 656.

We repeated and again reaffirmed the rule in *Mutti v. Boeing Aircraft Co.*, 25 Wn. (2d) 871, 172 P. (2d) 249, wherein we used this language:

"At the time appellant was injured, he was not engaged in the actual performance of any duty required of him by his contract of employment, but to the contrary, he had started down to the main office after his defense bond, during the rest period, *when he was absolutely free to go where he pleased, and at a time when his employer had no control over him.* The procuring of this bond by appellant, or the handling of these bonds by Frye & Company, was of no benefit to the employer, and that service was performed by it solely for the convenience of its employees. In the instant case, it further appears that appellant was not paid for the half-hour rest period, and that no premiums or assessments were paid by the employer to the department for the half-hour lunch period.

"The *D'Amico* case has definitely established in this state the rules to be followed in determining whether or not an employee is in the course of his employment under our workmen's compensation act.

"In the *Purinton* case, *supra,* the opinion, after referring to that part of the opinion in the *D'Amico* case which enumerates the conditions essential to a recovery under the workmen's compensation act, states:

" 'Following a statement of the facts in that case, the foregoing quoted paragraph was the first legal principle announced therein by the court in the majority opinion. There can be no doubt that this declaration was deliberately and advisedly made, and was in finality so accepted by those who signed the majority opinion, because, in the dissenting opinion (in which the present writer concurred) the attention of the court was by repetition of the above quotation directed immediately to the effect of the majority holding and to the resultant conflict with the general rule theretofore recognized by us in cases stating that:

" ' "It is not essential to the right to receive compensation *that the employee should have been working at the particular time when the injury was received,* also stating that the employment is not limited to the *exact moment when he begins* work or when he quits work." '

"The opinion in the *Purinton* case continues:

" 'It is thus apparent that in the *D'Amico* case, *supra,* the majority of this court intended to hold, and did specifically declare, that in order *to entitle one to the benefits of the*

*industrial insurance act,* he must, among other essential conditions, be in the *actual performance of the duties required by the contract of employment.'* (Italics ours.)

"The opinion in the *Purinton* case was concurred in by the writer of the opinion in the *D'Amico* case, so it must be concluded that he agreed with the above-quoted statements." (Italics ours.)

II. Having determined that respondent Rose McCarty did not sustain injuries in the course of her employment as an elevator operator in the Seattle Chamber of Commerce building, and that appellant Dr. Ostrom was in error in refusing to certify her as one entitled to physician's, nurses', and hospital care, we come to a determination of the second main question involved in this appeal, which is: What rights, liabilities, and obligations inure to the respective parties to this action from the two contracts before us, namely, the contract between the service corporation and Seattle Chamber of Commerce, and the contract between the service corporation and Seattle General hospital? In order to determine the definite contractual status of Rose McCarty, her employer, the Seattle Chamber of Commerce, the service corporation, and the Seattle General hospital, a brief summary at this point may be helpful.

It will be recalled that, on the day she sustained her injuries and for an appreciable period prior thereto, Rose McCarty was employed as an elevator operator by the Seattle Chamber of Commerce; that it had entered into a medical service contract with the service corporation, which, in order to be able to carry out the terms of its contract with the Seattle Chamber of Commerce, had previously entered into a separate contract with the Seattle General hospital. The pertinent provisions of the standard group medical aid contract entered into between the service corporation and the Seattle Chamber of Commerce are as follows:

"IN CONSIDERATION of the compensation hereinafter provided, and upon compliance with the stipulations hereinafter contained, KING COUNTY MEDICAL SERVICE CORPORATION, a charitable corporation, having its principal place of business at Seattle, Washington, and hereinafter described

as the 'Company,' hereby offers to those employees, not over 65 years of age, of CHAMBER OF COMMERCE, a group, having its place of business in the state of Washington, at Seattle, hereinafter called the 'Employer,' the special contracts with their privileges and benefits, which privileges and benefits are hereto attached and enumerated as exhibits 'A' to 'D' inclusive, and hereby offers the enjoyment of the privileges and benefits which are offered in said contracts, subject always to the following terms and conditions, towit:

"1. It Is AGREED and understood that the company is acting as the agent of said employer and of his said employees, which employees are hereinafter referred to as 'Patient,' in securing the propositions which are contained in the riders attached hereto and marked 'A' to 'D' inclusive, . . .

"3. The company shall furnish the employer at the date of this agreement and at reasonable times thereafter with a list of the individuals, firms and corporations which are offering the services provided for in the said riders to this agreement. . . .

"5. In presenting the various offers herein contained, the company acts only as the agent of the parties offering such services and assumes no liability for the breach of any one or all of said contracts. The company agrees, however, that in the event of a breach it will use its best efforts to procure other individuals, firms or corporation to offer the same or similar services. . . .

"8. *The medical director of the company, who is hereinafter referred to as the 'medical director,' or any physician whom he may designate, shall have the exclusive and absolute right to determine whether any patient is entitled to treatment, and if so, to what treatment, and any such determination made in good faith shall be deemed and held to be conclusive and binding upon the company, the patient, his heirs, executors, administrators and dependents and upon the employer if the employer be interested, and upon those offering said services.* . . . (Italics ours.)

"10. The services which are hereby offered are subject to the limitations specified in the riders hereto attached and in no event shall any such service be furnished outside King County, Washington, except upon the written approval of the medical director previously given, *nor shall any such service be furnished for care of any injury sustained while in the course of employment.*"

This standard group medical contract also provides, in its exhibit B:

"The hospitals, the names of which appear upon a list delivered by King County Medical Service Corporation, which is hereinafter referred to as the 'Company,' to CHAMBER OF COMMERCE the employer, on behalf of its employees, which delivery is being made at the time of the execution of the attached agreement, hereby agree, each for itself and not one for the other, that they and each of them will for a period of not to exceed Twenty-six (26) weeks, *furnish to the patients described in the attached agreement, such hospital and nursing services as may be reasonably required and authorized by the medical director of the Company in the treatment of any injury or sickness which is covered by the service of the members of the King County Medical Service Bureau under the attached agreement."* (Italics ours.)

The applicable provisions of the "Hospital Service Agreement," entered into between King County Medical Service Corporation, designated therein as the "company," and the Seattle General hospital, are:

"THAT WHEREAS, the Company proposes to act as agent of various persons in securing for them the privileges and benefits of group health, medical, surgical, ambulance and nursing service and hospitalization and to act as agent for the respective physicians, surgeons, hospitals, druggists and others who are furnishing such service in collecting their compensation therefor, now therefore, in consideration of the premises and mutual covenants hereinafter contained.

"IT IS AGREED AS FOLLOWS:

"I. The hospitals agree, each for itself and not one for the other, that each hospital will contract directly with all persons, or directly with the employers of all such persons who shall comply with the stipulations required by the company and the hospitals will render to such individuals, the services hereinafter defined. . . . all upon the terms and conditions as set forth in the printed contract of the company as the same now exists, *or as the same shall be changed by the company* and upon said printed form of contract the agreement of the said hospitals to furnish services is evidenced by the following language, to-wit:

" 'The hospitals, the names of which appear upon a list delivered by KING COUNTY MEDICAL SERVICE CORPORATION,

. . . hereby agree . . . that they and each of them will for a period of not to exceed Twenty-six (26) weeks, furnish to the patients described in the attached agreement, such hospital and nursing services as may be reasonably required and authorized by the medical director of the Company . . .'

"The Company agrees, that after notification by the hospital of the admission of a patient claiming benefits under a contract with the Company, it will within two laboring days from the time of such notification, *either reject responsibility in writing or furnish a written order to the hospital authorizing hospitalization of the patient at its expense, which order shall not be revocable.*

"III. The Company agrees that it will collect from such individuals, groups and/or employer, the monthly payments in accordance with the schedule provided for in the printed form of contract, which has been adopted by the Company, or as the same may be changed.

*"Out of said collections the Company shall pay the hospital for such services as the hospital may perform for such patients. . . .*

"IV. The parties hereto agree that the execution of this agreement and of the agreement between the Company and such individuals, groups and/or employers *shall together constitute a direct contract between the hospitals and the patients to furnish the services herein specified;* that the Company has no interest in such contracts except to secure acceptances of the offer herein made by the hospitals and to collect the fees herein specified for the use and benefit of the said hospitals. . . .

"VI. It Is Also Agreed between the parties hereto that the collection by the Company from such individuals, groups, or employees of the sums specified in the contracts between the Company and such individuals, groups, or employees, together with the payments to be made by patients, as provided for in Paragraph 7 of the Standard Group Medical Contract, *shall, insofar as the patients are concerned, be in full compensation of the services which are hereby offered by such hospitals and that when such sums are paid to the company the hospitals shall be bound to render to such individuals, groups, or employees the services herein enumerated* and that in the event of the failure of the Company to pay said sums to the hospitals, then the hospitals shall look only to the Company for said sums and that the receipts of the Company to such individuals,

groups, or employees shall be binding upon the hospitals." (Italics ours.)

As noted earlier in this opinion, judgment was entered in favor of the McCartys and against the service corporation in the sum of $442.50 to cover the expense of Mrs. McCarty's special nurses. Judgment was also entered in favor of the McCartys and against Seattle General hospital denying the latter relief in its suit, by cross-complaint, for the amount of Mrs. McCarty's general hospital bill.

On this appeal, the service corporation contends that liability cannot attach to it, under the terms of its two contracts, in that it is merely an agent of the several contracting parties and beneficiaries and not an insurer or guarantor of performance of the contracts. It predicates this contention largely upon the authority of *State ex rel. Fishback v. Universal Service Agency,* 87 Wash. 413, 151 Pac. 768, Ann. Cas. 1916C, 1017, wherein it was held that contracts similar in purpose did not attach the liability of an insurer to the service agency and that no primary liability attached to the service agency for failure of either the doctor or the hospital to render medical aid or hospital care to a contributing member.

Appellant service corporation likewise places stress upon the case of *Jordan v. Group Health Ass'n,* 107 F. (2d) 239, wherein medical service contracts, similar in purpose to the ones before us, were held to place the parties thereto on the legal plane of consumers' co-operatives. Judge Rutledge, then a member of the United States court of appeals for the District of Columbia, held that the group health association was not an insurer, and that the contracts did not obligate the association to indemnify members who had not received the service contracted for when eligible therefor. The opinion in the *Jordan* case refers with approval to *State ex rel. Fishback v. Universal Service Agency, supra.* There is, however, a marked distinction between the contracts in the present case and those considered in *Jordan v. Group Health Ass'n* and in the *Universal Service Agency* case, *supra.*

Group Health Association was a nonprofit corporation, organized in Washington, D. C., by a large number of members, who were civil service employees of the Federal government, for the purpose of securing for themselves and their families cheaper medical service by quantity purchasing and economies in operation. In the opinion in the *Jordan* case, Judge Rutledge said: "Group Health is in fact and in function a consumer cooperative." King County Medical Service Corporation is designated in its contract as a "charitable corporation." No intimation appears, however, in the record as to its incorporators or who they may be, but, certainly, it is wholly evident that they were not the thousands of employees of Seattle Chamber of Commerce and other employers similarly contracting for medical aid. The service corporation in the present case is not a consumers' co-operative, nor do any of the parties hereto contend that it is. It is a private corporation, a distinct entity in the eyes of the law, dealing with employee beneficiaries on the one hand and with physicians and hospitals on the other.

Further distinction between the *Jordan* and the *Universal Service Agency* cases, *supra,* and the instant case is to be found in the provisions relating to the authority and control to be vested in the respective service agencies over the business contemplated by the contracts, and in the terms relating to the retention and disposition of funds collected by them. In the contract before us, full authority to determine the eligibility of employees to receive the medical services contracted for reposes in the service corporation. In paragraph 8 of its contract with Seattle Chamber of Commerce, the following appears:

"The medical director of the company, who is hereinafter referred to as the 'medical director,' or any physician whom he may designate, *shall have the exclusive and absolute right to determine whether any patient is entitled to treatment,* and if so, to what treatment, and any such determination made in good faith shall be deemed and held to be conclusive and binding upon the company, the patient, his heirs, executors, administrators and dependents

and upon the employer if the employer be interested, *and upon those offering said services."* (Italics ours.)

Paragraph 11 of the same contract contains the following provision:

"In consideration of the agreement hereinbefore set forth to be performed by the persons on whose behalf the company is offering said services, the employer agrees that he will pay to the King County Medical Service Corporation on or before the 15th day of each and every month hereafter while this agreement shall remain in effect, according to the following schedule: $1.75 per month for each employee authorizing such deduction employed during the preceding pay-roll period, which amount the employer hereby agrees to deduct from the pay of each employee authorizing such deduction on the first day of each such period of employment. *All monies so collected by said employer shall be kept by it separate and apart from its own funds and shall constitute a trust fund, title to which shall at all times vest in The Company and not in The Employer."* (Italics ours.)

Neither of these provisions appeared, either in substance or in form, in the contract which was before this court in *State ex rel. Fishback v. Universal Service Agency, supra,* and no such sweeping authority is to be found in the contract discussed in *Jordan v. Group Health Ass'n, supra.* True, the opinion in the *Jordan* case, in outlining the terms of the service contract by reference, states:

"(3) Further, the Trustees may determine or modify the extent of service so made available (presumably as to *all* members collectively) at any time on fifteen days' written notice; (4) the Medical Director may determine the extent of the services which will be available to members *in each individual case."*

We construe these provisions in the contract as merely expressive of the authority reposing in the association's medical director to diagnose and determine whether or not the individual's ailment or injury was included among those covered by the contract and, thus, subject to treatment under its terms. This calls for medical training and decision only. There is no provision of the contract suggested in the opinion which would make the medical di-

rector's finding exclusive and absolute and not subject to review by the board of trustees.

In the present case, similar authority reserved by the service corporation as to all questions, medical and legal, is, in its own language, exclusive and absolute. The language of the provisions in the contract before us, we believe, leads to the controlling distinction between this case and the *Jordan* and *Universal Service Agency,* cases, *supra.* The authority reserved to the service corporation in the instant contract is not delegated authority. It is that of a principal. It is a right to make final decisions, which, in this contract, is absolute. This is not the power of an agent, it is the function of a principal, and it makes the service corporation, in the contract before us, not an agent of, but a coprincipal with, the physicians, hospitals, and employers, as contracting parties with the employee.

It is true that the standard group medical contract between Seattle Chamber of Commerce and the service corporation contains provisions which, read alone and without reference to other provisions, would indicate that the service corporation wishes to retain the status of an agent and to avoid the legal responsibility of a principal. Paragraph 5, for instance, is typical of this. It provides:

"In presenting the various offers herein contained, the company acts only as the agent of the parties offering such services and assumes no liability for the breach of any one or all of said contracts. The company agrees, however, that in the event of a breach it will use its best efforts to procure other individuals, firms or corporation to offer the same or similar services."

The use of the words "agency agreement" and "agent" in a contract does not necessarily establish a relationship of agency. *Stephens v. Detroit Trust Co.,* 284 Mich. 149, 278 N. W. 799. And, in *Wheatman v. Hoe & Co.,* 158 Wash. 232, 290 Pac. 853, we held that the use of the word "agency" in an agreement does not establish agency in the legal sense. See, also, 2 Am. Jur. 26, § 24; 2 C. J. S. 1026, § 2; *Piper v. Oakland Motor Co.,* 94 Vt. 211, 109 Atl. 911; *Falls Rubber Co. v. La Fon,* 256 S. W. (Tex.) 577. The

name which the parties give to the relationship is not determinative. Restatement of the Law of Agency, vol. 1, p. 46, § 13, comment c; *Shultz v. Manufacturers & Traders Trust Co.,* 40 F. Supp. 675.

The predominate purpose of the service corporation, as evidenced by paragraph 8 of its contract with employers, is to control the business which its contract promotes and provides for, namely, the rendering of service to members and the collection of fees or premiums from such members in consideration therefor. The service corporation alone, of all of the parties to the agreement, has the highest degree of exclusive control and authority over the business contemplated by the terms of the respective agreements. When a person styling himself as an agent is a named contracting party and reserves to himself, by the terms of the contract, the exclusive and binding authority to decide all questions presented by the contract, and when the exercise of such authority is, by express written provision, made binding upon all parties to the contract and all claiming by or under it, then, certainly, he is not an agent but is, in fact and in law, the principal and the moving spirit in control of every phase of the business contemplated by the contract.

█ It is a familiar rule that a principal has control over the actions and conduct of his agent within the scope of the business being carried on by him.

"The fundamental idea of agency has its conception in something lawful that a person may do and a delegation by such person to another of the power lawfully to do that thing." 2 Am. Jur. 14, § 3.

"A principal, in the law of agency, is the person for whom another acts and from whom he receives his authority to act." 2 Am. Jur. 13, § 2.

In 1 Restatement of the Law of Agency 47, § 14, it is said:

"A principal has the right to control the conduct of the agent with respect to matters entrusted to him.

"b. . . . Where the existence of an agency relationship is not otherwise clearly shown, as where the issue is whether a trust or an agency has been created, the fact

that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relationship is not that of agency.

"c. There are many relationships in which one acts for the benefit of another which are to be distinguished from agency by the fact that there is no control by the beneficiary. Thus, executors, guardians, and receivers, although required to act wholly for the benefit of those on whose account the relationship has been established, are not subject to their directions."

Control is the vitally essential element in the relationship of principal and agent. 1 Restatement of the Law of Agency 7, § 1 (1), defines "agency" as follows:

"Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and *subject to his control,* and consent by the other so to act." (Italics ours.)

The editors of American Jurisprudence define a "principal" as

". . . the person for whom another acts and from whom he receives his authority to act. The agent is the substitute or representative of his principal, who acts for and represents the principal, and who derives his authority from him." 2 Am. Jur. 13, § 2.

■■ There is no evidence of intention to delegate authority or control to the service corporation, either from the Seattle Chamber of Commerce in the standard group medical contract or from Seattle General hospital in the hospital service agreement. On the contrary, control, power, and authority to conduct the business of the parties are expressly reserved and vested in the service corporation. Title to all money collected is expressly reserved in the service corporation as trustee. The appellant service corporation, under the terms of its own contract, is, of necessity, a principal. It derives no authority from anyone. It is the fountainhead and primary source of authority. It is the trustee of the money collected by it. While it styles itself a charitable corporation, there is no reference to be found in any of its contracts relating to the disposition

of any profits left in its hands, over and above the disbursements made to physicians, hospitals, and nurses.

It should be noted that the service corporation, under the terms of its contract with the employer, collects all of the money which is involved in the transactions covered by the contracts. It makes all remittances to the physicians, hospitals, and nurses for the services furnished, at its instance, to employee members. The contract vests title in these funds in the service corporation. This, also, negatives the idea of agency, because, by express terms, a trust is created and the service corporation is made trustee. A trustee is not an agent, in so far as the disbursement of funds in its possession is concerned. 2 C. J. S. 1034, § 2 k, states:

"The essential distinctions between a trust and an agency are to be found ordinarily in the fact that in a trust the title and control of the property under the trust instrument passes to the trustee who acts in his own name, while the agent represents and acts for his principal, and in the further fact that while a trust may ordinarily be terminated only by the fulfillment of its purposes an agency may in general be revoked at any time.

"While it may be difficult to define strictly, at all times, the line of distinction between an agent and a trustee, the essential distinction lies in whether the one who stands in the position of principal or donor parts entirely with the control, possession, and right of disposition of the property involved. For example, where property is irrevocably conveyed to one to manage, sell and reduce it to cash for the benefit of others, the grantor reserving no control, and the party being called a trustee, the relation is a trust, and not an agency."

2 Am. Jur. 15, § 6, discussing the subject "Agency," states:

"Trustees and agents are distinguishable chiefly in the character in which they act and in the persons for whom they act. The agent, on the one hand, has the distinguishing features of his representative capacity and his derivative authority, and his acts are designed to be those of his constituent. On the other hand, a trustee is established and may be defined generally as a person in whom an estate,

interest, or power in or affecting property is vested for the benefit of another."

See, also, *Merchants Nat. Bank of Aurora v. Frazier*, 329 Ill. App. 191, 67 N. E. (2d) 611; *Anderson v. Abbott*, 61 F. Supp. 888; *Waldo Fertilizer Works v. Dickens*, 206 Ark. 747, 177 S. W. (2d) 398; *Magallen v. Gomes*, 281 Mass. 383, 183 N. E. 833; *Taylor v. Davis' Adm'x*, 110 U. S. 330, 28 L. Ed. 163, 4 S. Ct. 147; *Light v. Scott*, 88 Ill. 239.

For the reasons stated herein, and under the authorities cited, we hold that the service corporation is a principal, or primary contracting party, to each of the agreements under consideration; that it is, therefore, directly liable for violation of its contract in refusing, through its medical director Dr. Ostrom, to accept and certify Rose McCarty for all of the benefits and services accruing to her under the contracts, as an employee-member of the medical aid group.

 It is urged by appellants that the service corporation is not to be classed as an insurer, under the terms of Rem. Rev. Stat.; § 7032 [P.P.C. § 652-1], and as that statute has been construed in *State ex rel. Fishback v. Universal Service Agency, supra.* This contention is again predicated upon the theory that the service corporation is only an agent guaranteeing to bring together employees and employers on the one side, and physicians and hospitals on the other. Section 7032 defines "insurance" as follows:

"Within the intent of this act the business of apportioning and distributing losses arising from specified causes among all those who apply and are accepted to receive the benefits of such service, is public in character and requires that all those having to do with it shall at all times be actuated by good faith in everything pertaining thereto; shall abstain from deceptive or misleading practices, and shall keep, observe, and practice the principles of law and equity in all matters pertaining to such business. Upon the insurer, the insured, and their representatives shall rest the burden of maintaining proper practices in said business.

"Insurance is a contract whereby one party called the 'insurer,' for a consideration, undertakes to pay money or its equivalent, or to do an act valuable to another party

called the 'insured,' or to his 'beneficiary,' upon the happening of the hazard or peril insured against, whereby the party insured or his beneficiary suffers loss or injury."

Holding, as we do, that the service corporation is a co-principal with the hospital and employer and employee on its contract, we believe that the business being conducted by the service corporation meets the requirements of this statute and that it performs the functions of an insurer. It sells medical protection to working people against the hazard of injury or illness. It releases the employer from the care and expense of medical and health aid to his employees. It collects a fixed premium from each employee and reduces the respective rights and obligations of all of the interested parties to a written contract [policy]. Through its medical director, it determines when coverage applies to the employee—when it does not apply. All of this brings the business of the service corporation within the spirit and purpose of the statute.

In *Allin v. Motorists' Alliance,* 234 Ky. 714, 29 S. W. (2d) 19, 71 A. L. R. 688, the court of appeals of Kentucky said:

"It is suggested in brief for appellee that the contract shows, on its face, and so states, that it is not an insurance policy. But that is wholly beside the question. No one can change the nature of insurance business by declaring in the contract that it is not insurance. As was said in the case of *State v. Beardsley,* 88 Minn. 20, 92 N. W. 472, 474: 'The real character of this promise, or of the act to be performed, cannot be concealed or changed by the use or absence of words in the contract itself; and it is wholly immaterial that on its face this contract does not expressly purport to be one of insurance, and that this word nowhere appears in it. Its nature is to be determined by an examination of its contents, and not by the terms used.'

"It is argued by the assistant Attorney General, in his supplemental brief, that the contract should be declared void because, under the provisions of section 98-6, Ky. Stats., no person is allowed to practice law in this state without being licensed and sworn as therein provided, and that this contract provides for the practice of law in this state by the corporation without compliance with that law. But we find it unnecessary to determine that question.

"No question is determined other than that the provision of the contract to provide for services of an attorney, free of charge upon the happening of certain contingencies, is insurance within the meaning of section 687, Ky. Stats."

And, in *Physicians' Defense Co. v. O'Brien,* 100 Minn. 490, 111 N. W. 396, quoted with approval in 63 A. L. R. 766, the court said:

" 'The books are full of definitions of insurance, and the contract has been variously described and characterized. Underlying all the definitions, except in life insurance, is the idea of indemnity. We are not required to go afield for a definition, as Rev. Laws 1905, § 1596, states that insurance, within the meaning of this chapter, is any agreement whereby one party, for a consideration, undertakes to indemnify another to a specified amount against loss or damage from specified causes, or to do some act of value to the assured in case of such loss or damage. The nature of the contract must be determined from its contents, and not by its terminology. Comparing this contract with the statutory definition, we find that one party (the company), for a consideration (stated therein), undertakes to indemnify (that is, protect against, make good, by standing the expense of the litigation), another (the physician) to a specific amount (not to exceed $5,000, etc.), against loss or damage from a specific cause (an action for malpractice). In addition to paying the expenses of the litigation, the company agrees to employ counsel and defend suits; that is, in the language of the statute, to "do some act of value to the insured in case of such loss or damage." It does not require the citation of authorities to show that an agreement to save the assured harmless from a part of a loss is as much a contract of insurance as an agreement to indemnify against an entire loss.' "

See, also, Ann. Cas. 1916C, note p. 1022; Ann. Cas. 1916E, note p. 1159.

Whether we call the service corporation an insurer or merely a co-obligor, our conclusion is that it has assumed a contractual responsibility which it must respect. If special privileges or immunities are to be reserved to it which would exempt it from the plain obligations of its contract, the legislature should be importuned, not the courts.

This brings us to the appeal of Seattle General hospital, for which contention is made that its bill for services against Rose McCarty should have been paid by her. Reversal of the lower court's judgment to the contrary is sought.

It should be noted that in exhibit B, which is an addendum to and part of the standard group medical aid contract between the service corporation and Chamber of Commerce, there is a provision reading as follows:

"The hospitals, the names of which appear upon a list delivered by King County Medical Service Corporation, which is hereinafter referred to as the 'Company,' to CHAMBER OF COMMERCE the employer, on behalf of its employees, which delivery is being made at the time of the execution of the attached agreement, hereby agree, each for itself and not one for the other, that they and each of them will for a period of not to exceed Twenty-six (26) weeks, furnish to the patients described in the attached agreement, such hospital and nursing services as may be reasonably required and authorized by the medical director of the Company."

That the Seattle General hospital appeared in a list referred to and which was submitted to the Seattle Chamber of Commerce by the service corporation, clearly appears from the colloquy between counsel at the trial. Mr. Riddell, attorney for the service corporation, while engaged in reading the standard group medical contract, interpolated the following:

"While I think of it, counsel, you have a current list at that time which was furnished? And the Seattle Chamber of— Seattle General Hospital is on that current list at that time. MR. CAUGHLAN: That is right."

In fact, the service corporation and the Seattle General hospital stipulated in their formal contract that which, of necessity, would have been implied in their agreement, namely:

"The parties hereto agree that the execution of this agreement and of the agreement between the Company and such individuals, groups and/or employers shall together constitute a direct contract between the hospitals and the patients to furnish the services herein specified."

█ Clearly, the intent and legal effect of this provision was to set up a direct contractual relationship between Seattle General hospital and Seattle Chamber of Commerce for the benefit of its employees, by the terms of which the employees were to be furnished medical and nurses' care and hospitalization under certain contingencies. The hospital adopted *in haec verba* the language of the contract entered into between the service corporation and the Seattle Chamber of Commerce, in so far as it contained an obligation imposing upon it, the hospital, the duty of furnishing hospitalization and nurses' care for employee-members. It cannot be denied that Rose McCarty, the elevator operator who, upon request of her employer, Seattle Chamber of Commerce, authorized the deduction of $1.75 per month from her pay check as consideration for the medical, physician's, and hospital service which was promised to her, understood what she was supposed to receive in the event she would incur sickness or injury. This conclusion becomes more apparent when we adopt the rule which the contract itself provides for, namely, that the two agreements be read and construed as one. The hospital had no cause of action against Rose McCarty for the amount of her hospital bill. Its action by cross-complaint against her and her husband was properly dismissed.

Appellant service corporation, in its reply brief, states that the standard group medical contract between the service corporation and the employer has been passed upon in two recent cases in this court, namely, *Jacobsen v. King County Medical Service Corp.*, 23 Wn. (2d) 324, 160 P. (2d) 1019, and *Schultz v. King County Medical Service Corp.*, 24 Wn. (2d) 432, 165 P. (2d) 857.

We cannot agree with appellant that the contracts were construed as to their validity or the extent of their binding force upon the respective contracting parties in either of the cases referred to. In the *Jacobsen* case, *supra*, we held that there was no evidence of a contract between the Boeing Aircraft Company and Hansen, its deceased employee, in behalf of whose estate Jacobsen sued as administrator. The opinion recites that there was a prospectus in evidence and

that some legal relationship existed between the employee, Hansen, and the service corporation. The court's exact language is:

"There is no evidence of an agreement between Hansen and respondent medical service corporation. The latter admitted a legal relationship between itself and Hansen based upon a written contract, under which it contended the nature of Hansen's illness was such that it was not covered by the contract. *Appellant refused to permit proof of the terms of the written contract; and failed to prove breach by respondents of an oral contract to provide medical and hospital services to Hansen.*" (Italics ours.)

Clearly, the issues presented in that case did not bring the court to the point where it was faced with the duty of construing the two contracts which are before us in the present case.

In the *Schultz* case, *supra,* examination of the briefs shows that the question of the construction of two contracts, identical in every particular with those now before us, was sought to be presented; but that inquiry became unnecessary when this court held that, regardless of the extent of liability attaching to the respective parties under the two contracts, the appellant Schultz had failed to bring himself within their terms. The decision of that case very rightfully turned upon the factual elements which removed the plaintiff's cause of action from the effective scope of the contracts. Schultz was the victim of an ulcerous condition which had existed for several years prior to the time his employer entered into the standard group medical contract with the service corporation. He was given treatment, however, which was paid for by the service corporation. More than twenty-six weeks thereafter, the same physician who had treated him, initially, determined that the ulcer was perforated and that operative treatment was necessary. It was the expense of this latter operation that Schultz endeavored to collect from the service corporation and which constituted the basis of his action against the service corporation. Two specific provisions of the medical group contract excluded Schultz's cause of action. His ailment was one which had existed long prior to his becoming a

beneficiary under the contract. The specific treatment which became the basis of the suit was administered after the expiration of twenty-six weeks from the date of his first treatment. It was not necessary, therefore, to construe the contracts in that case or to otherwise measure the respective rights and liabilities defined in them.

It would appear, however, by implication, that had Schultz been able to bring his case within the terms of the contract, its binding force upon the service corporation, which was the only defendant named, would have been recognized in that opinion. The court's language in this connection is significant:

"We conclude, after a study of the contract and the evidence introduced at the trial, that there was no evidence or inference from evidence which justified the court in submitting the case to the jury. On the other hand, the evidence showed that appellant had complied with its agreement contained in the contract."

We find that Rose McCarty was not injured in the course of employment, but prior to assuming her duties and at a time when she was not under pay; that, as an employee-member of the medical aid group, she was entitled to hospitalization, nurses' and physician's care; that the King County Medical Service Corporation and the Seattle General hospital are coprincipals in the contract entered into between them and the Seattle Chamber of Commerce and that the service corporation is a trustee of the moneys collected by it; that they are jointly and severally liable for the expense of the service administered to Rose McCarty; that the judgment against the service corporation and in favor of McCarty and wife for the sums paid for nurses' expense is a proper one and should be affirmed; that the judgment denying the Seattle General hospital recovery of the amount of its bill for hospital care incurred by Rose McCarty is likewise proper and should be affirmed.

The judgment appealed from is affirmed.

ALL CONCUR.

---

January 31, 1947. Petition for rehearing denied.