[No. 27259. Department One. August 12, 1939.]

ROY YOUNG, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

[1]Reported in 93 P. (2d) 337.

*Moe & Hunter* and *Vanderveer & Bassett*, for appellant.

*The Attorney General* and *J. A. Kavaney, Assistant,* for respondent.

STEINERT, J.—A claim for compensation under the workmen's compensation act was filed by an injured employee and was denied by the supervisor of the department of labor and industries. On a rehearing by the joint board of the department, the order of the supervisor was affirmed. An appeal to the superior court resulted in a confirmation of the order of the joint board. The injured claimant thereupon appealed to this court, and hereinafter will be referred to as appellant.

The only question involved on the appeal is whether or not, at the time of his injury, appellant was in the course of his employment within the meaning of the workmen's compensation act.

The facts which give rise to that question are as follows: From August, 1935, to January 6, 1937, appellant was employed as a common laborer on the Grand Coulee Dam project. During the first four months of his employment, he assisted in the hauling of material to various parts of the construction; during the last four weeks of his work, he was a member of a clean-up crew, whose duties were to collect and remove all left-over material, debris, and rubbish from various parts of the dam, as directed by the foreman. Prior to January 2, 1937, C. R. Durham was foreman of the crew. Thereafter, and on the day of appellant's injury, Paul Waller was in charge.

The portion of the dam located near midstream was designated "block 40." On the face of the block there

was an opening about eight feet square, and from this opening a ladder or stairway twelve feet in length led to a gallery, which was about five feet wide, extending through the dam. Approximately twenty-five feet from the entrance to the gallery, a transverse gallery ran crosswise of the block. Some distance within this second gallery, there was a vertical shaft, three feet square, extending a distance of fifty feet down to the next lower level of the dam. A wooden cap had been constructed for the purpose of covering the aperture. This cover was easily removable to permit use of the bore of the shaft.

Upon two occasions, about three months before the date of the accident, appellant, while under the supervision of the foreman Durham, had worked with the crew cleaning up material left in the galleries. For the greater part of the time, however, and particularly while working under the supervision of foreman Waller, appellant's duties were confined to clean-up work outside the galleries.

Appellant's hours of labor were from eight a. m. to twelve noon, and from one p. m. to four p. m. He was paid at the rate of sixty cents per hour. During the noon period, for which the men received no pay, they were not under supervision unless called upon by their foreman to do some special or extra work. The workmen customarily brought their lunches, which they ate on the premises at whatever places they desired; on account of the distances to their homes, it would have been impracticable to do otherwise.

Appellant had at one time asked his first foreman, Mr. Durham, for an increase in pay, and was told that he did not "know enough yet," and that he would have to "learn his way around a little better" before he could be paid more. By this, the foreman stated at the trial that he meant that the appellant would have

to know more about the premises and how better to handle himself.

On January 6, 1937, appellant ate his lunch, as usual, near the place where he had been working, and at about 12:30 p. m. concluded that he would visit the interior of block 40. Inasmuch as the succeeding events touched the crux of the case, we quote his own testimony:

"Q. What prompted you to go down that direction? A. What made me go that way? Q. Yes, what caused you to decide to go down there? A. Well, I had heard all the boys speaking of block 40 and I asked one of the boys that worked down there to come and go with me and he says, 'No, there is nothing down there, that I care to see. I have been down there lots of times and this fire feels pretty good. I think I will stay here.' So I walked down that way and in the meantime I saw some boards that had to be thrown out and we had to throw all the boards— Q. (Interposing) just a minute before going into that, what was your reason in your own mind for wanting to go down there to look around? A. You mean why did I start down that way? Well, I started down for the toilet. Q. When you went in block 40, what prompted you to go inside? A. I saw some material they had thrown out—you mean what caused me to go there? Q. Yes. A. I saw some boards and some rubbish and she bolts and different things that had to come out. Q. Was there any other reason that you felt for wanting to look around in there? A. The big reason was, the main reason, that I wanted to get acquainted with what had already taken place and help myself so that I could learn construction; learn how the dam was built. I helped haul over lots of this material that went in there. Some of it was the cooling pipes, and I would like to see how far the cooling pipes were put apart and how high up—look it over. I helped haul over some of those large gallies and I wanted to see what they looked like. Q. Let me ask you this question. Did you go in there just purely for the purpose of amusement? A. No, because lunch hour was the

only time I had any time of my own in order to familiarize myself, get myself acquainted with the job and the construction.  Q.  What was your object in getting yourself acquainted with the job and the manner in which the project was being constructed in that vicinity?  A.  Well, so as to make myself more valuable to the company, so that if the opportunity ever come that I could hold a better position and get more salary. That is what we was after—we are all up here for what salary—what money we can get.  I was told one time by Mr. Durham, the foreman, the sooner I was more valuable to the company I would get more money."

It is not contended upon the appeal that appellant went into the interior of the block for any purpose other than to inspect the premises and to familiarize himself with the character of the construction.

Appellant descended from the outside of the dam through the opening in its face, proceeded along the gallery, and turned to the right at the transverse gallery, through which he pursued his way until suddenly he fell down the shaft, as a result of which he was severely injured.  There was not sufficient light in the gallery to enable appellant to see the shaft.  Apparently, also, the cover of the shaft had been moved, wholly or partially, from its accustomed place.  There were no warning signs, nor, so far as appellant was concerned, had any instructions been given forbidding the men to go into the galleries.

With this factual situation before us, we consider the law upon the subject.

■ Rem. Rev. Stat., § 7675 [P. C. § 3470], provides:

"Workman means every person in this state, who is engaged in the employment of any employer coming under this act whether by way of manual labor or otherwise, *in the course of his employment:*  . . ." (Italics ours.)

The statute does not define the phrase "in the course of his employment," and we therefore look to the cases for the meaning ascribed to it.

As stated in 71 C. J. 658, § 404, a definition, widely adopted, is that

"An injury to an employee arises in the course of his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental to it."

Numerous cases adopting that definition, or others closely similar thereto, are cited in the footnotes to the text.

The test adopted by this court for determining whether an employee is, at a given time, in the course of his employment, is whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, or by specific direction of his employer; or, as sometimes stated, whether he was engaged at the time in the furtherance of the employer's interest. *McGrail v. Department of Labor & Industries,* 190 Wash. 272, 67 P. (2d) 851, and cases therein cited.

The peculiarity of the case before us is that the accident happened during the noon hour, while appellant, though not at work, nor under the supervision of his employer, nor receiving pay for that period, was, nevertheless, on his employer's premises, and was engaged at the time of his injury in a personal exploration of a locality which he had not been forbidden to enter.

We have no cases from this jurisdiction presenting that exact situation, but there are several which bear a more or less close analogy.

In *Hama Hama Logging Co. v. Department of Labor*

& *Industries,* 157 Wash. 96, 288 Pac. 655, a logger, who was required to live at the camp of his employer, made a trip to a distant town on Sunday for recreational purposes. He was given free transportation for the trip on the company's gasoline speeder. The workman was not on regular duty nor under the supervision of his employer at the time, nor was he receiving compensation from his employer for that day; his time on the particular occasion was his own. During the course of the trip, and while riding on the speeder, he was injured. In denying him recovery, we held that an employee injured at a time when he is doing something solely for his own benefit or accommodation, and not while engaged in or furthering his employer's business, is not injured "in the course of his employment."

In *Carroll v. Western Union Tel. Co.,* 170 Wash. 600, 17 P. (2d) 49, a messenger boy owning a motorcycle was employed by a telegraph company and was paid for his services, including the use of his machine, a specified amount per hour. The boy kept the motorcycle in repair at his own expense. One afternoon, with the consent of his employer, he visited a store to purchase some accessories for his motorcycle. While returning to the office, he ran into and injured a pedestrian. Suit was brought by the injured person against the telegraph company. We affirmed a judgment denying recovery, on the ground that the messenger was not at the time of the accident in the course of his employment, but was acting solely for his personal and private purposes.

In *Hill v. Department of Labor & Industries,* 173 Wash. 575, 24 P. (2d) 95, it appears that a street car operator had stopped his car near a post office for the purpose of depositing a letter in the mail box in front of the building. While crossing the street, he was struck by an automobile. We held that the operator

was not, at the time of his injury, in the course of his employment. The opinion, however, recognized the distinction between that case and those cases wherein persons within the protection of the act temporarily left the places of their employment for the purpose of performing some act of necessity or convenience, such as procuring water or food.

Consulting the cases from other jurisdictions, we find many instances in which employees have been injured during meal hours when they were not actually at work. The general rule in such cases is that the injury is compensable if the employee was, at the time, doing something incidental to the duties for which he was engaged, but is not compensable if the injury resulted from an independent act of the employee having no connection with his work or his meal.

"In accordance with the general rule that injuries to an employee while he is doing something not strictly within his obligatory duty but which is incidental thereto may be compensable, harm which befalls an employee may be compensable when it occurs to him during the lunch period or other meal period. However, harm sustained during a meal period may not be compensable as arising out of and in the course of employment when the harm results from an independent act of the employee having no connection with his work or his meal, or from the independent act of a third person, or when the harm is sustained by reason of the employee's placing himself in a more dangerous position than was required of him during the meal period, or where sufficient evidence that harm sustained during the meal period was an accident arising out of and in the course of the employment is lacking." 71 C. J. 739, § 456.

Many cases from various jurisdictions are cited in the footnotes to the text.

The theory of the cases is that a period of rest, refreshment, or other temporary cessation from work, is

not of itself sufficient to break the continuity of employment, but that the independent act of the employee, which has no relation to the employer's interest, serves to break the so-called nexus and to put the employee without the course of his employment.

In this case, it is manifest that appellant's venture had no connection whatever with his meal. He was not seeking a place where he might eat, nor was he returning to work from a place where he had eaten. He had finished his lunch without any mishap and had entered upon a wholly separate and distinct undertaking. When he began his exploration of the interior of the dam, he was not under the supervision or control of his employer, but was on his own time. He was not then engaged in the performance of any of his obligatory duties or anything incident to them. He was not performing a task in furtherance of his employer's work or interest, but was engaged in a voluntary exploration of his own conception. We are satisfied that appellant was not in the course of his employment, within the meaning of the workmen's compensation act.

The situation was nowise altered by the fact that the alleged purpose of appellant's venture was to acquaint himself with the intricacies of the project and, by thus increasing his value to his employer, ultimately to obtain an increase of wages for himself. The course of his employment required him only to do certain things, at certain times, at specified places, under the supervision of his foreman. It did not require him, nor was he expected, to abandon his routine of work, visit places unfamiliar to him, and expose himself to possible dangers, merely that he might thereby fit himself for a different course of employment. What information he may have expected to gain was solely for his own benefit and in no way contributed to the value of the work which he was engaged to perform. He was

not fulfilling any duty required of him by his contract, nor was he furthering the interest of his employer. He was engaged in an independent act having no connection with his work.

The judgment is affirmed.

BLAKE, C. J., MAIN, ROBINSON, and SIMPSON, JJ., concur.

