# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| LISA M. AZORIT-WORTHAM, | No. 58389-5-II |
| Respondent, | |
| v. | |
| DEPARTMENT OF LABOR & INDUSTRIES, | PUBLISHED OPINION |
| Respondent, | |
| ALASKA AIRLINES, INC., | |
| Appellant. | |

VELJACIC, A.C.J. — Alaska Airlines appeals a jury verdict finding that the Board of Industrial Insurance Appeals (Board) incorrectly denied Lisa Azorit-Wortham's workers' compensation claim. Alaska Airlines argues the trial court improperly instructed the jury on the traveling employee doctrine in the context of an occupational disease. Alaska Airlines also argues substantial evidence did not support the jury's verdict. Since the traveling employee jury instruction misstated the law and the presumption of prejudice has not been overcome, we reverse and remand for a new trial.

## FACTS

Azorit-Wortham is a Seattle-based flight attendant who was employed by Alaska Airlines for 17 years. While employed there, she contracted COVID-19 and filed a workers' compensation claim for benefits. The Department of Labor & Industries (L&I) allowed her occupational disease claim for COVID-19 in August 2020 with March 28, 2020 as the date of manifestation. Alaska

Airlines protested L&I's decision in October 2020, but L&I affirmed its decision to allow Azorit-Wortham's occupational disease claim for COVID-19. Alaska Airlines appealed the decision to the Board.

I.    HEARING BEFORE THE BOARD

At the hearing before the Board, Azorit-Wortham testified that from March 16 to 27, 2020, she worked or deadheaded[1] eight flights that included trips to Seattle, Orange County, Boston, Washington, D.C., and Nashville. These flights had a total of over 250 people on board, including passengers and crew members.[2] She said she would also have come into contact with hundreds of people walking through airports, taking transportation, and staying in hotels. She testified that her job duties consisted of greeting passengers; making announcements; preparing snacks, drinks, and meals; and handing them out using the cart that is pushed down the aisle. She also handled seat discrepancies, medical situations, "tending to [passengers'] needs, holding [a passenger's] baby, talking [passengers] through stress and anxiety, or just chatting with them." Clerk's Papers (CP) at 317.

On March 27, Azorit-Wortham deadheaded a flight from Boston to Seattle. She and two other deadheading crew members were moved to first class. During this flight, Azorit-Wortham used the restroom several times, used the coffee maker and coffee supplies, and interacted with the crew. Upon arrival, as a courtesy, Kaliko Howell, the inflight supervisor for the Seattle base, informed both the working and deadheading crew members that the pilot who had been on the

---

[1] Deadheading is when the flight crew members are on the plane as passengers but are not working.

[2] Azorit-Wortham testified there were 243 passengers and 45 crew members. However, other places in the record list 53 crew members. This figure (presumably) includes Azorit-Wortham. *But see* Br. of Resp't (L&I) at 8 (claiming the total is 296). It is unclear how many of the crew members overlapped on each flight.

previous flight, the flight from Seattle to Boston, tested positive for COVID-19. That pilot also possibly used the coffee pot. The managing director of station operations support testified that all surfaces in the lavatory would have been cleaned and disinfected and that surfaces in the galley would have been wiped down as needed. Howell testified neither the working crew members nor the deadheading crew members were required to quarantine.

Azorit-Wortham said she first began having symptoms on March 29. She went to an urgent care clinic and took a COVID test on March 30. She received confirmation that she tested positive for COVID-19 on April 1. She testified that her and her family were being extra cautious during the time between March 16 and March 27, including not attending social gatherings and only going out for necessities. Her credit card statements from early March showed she went to places such as Mod Pizza, Fred Meyer, Trader Joe's, Roundtable Pizza, Safeway, and a landscape supply company. On March 15, she went to Menchie's frozen yogurt. She also attended a baby shower in early March with 10 to 15 other women. Then, later in March, she went to Walmart and Costco. Azorit-Wortham's son's last day of in-person school was March 13, and her husband began working mostly remotely during the latter part of March. Azorit-Wortham said during this time, she came into contact with fewer than ten people outside of work. Her husband testified that he exhibited COVID-19 symptoms 8 to 10 days after Azorit-Wortham returned home from the Boston to Seattle flight.

Dr. James Boswell, specializing in occupational medicine and environmental health, conducted an independent medical examination of Azorit-Wortham. He stated that the opinion he formed in his examination was based off the understanding that the other crew members deadheading with her had direct exposure to the pilot that tested positive for COVID. He concluded her employment did not increase her probability of contracting COVID.

[Appellant's Counsel:] Could she have been exposed to an individual with COVID-19 at any point in time over the two weeks before she first developed symptoms?

[Dr. Boswell:] Yes.

[Appellant's Counsel:] When you're looking at an occupational disease claim, can you say that she would not have developed COVID-19 if she was not working as a flight attendant?

[Dr. Boswell:] . . . I can say that her work exposure did not have anything to do on a probability scale with the fact that she came down with the disease. She could have developed the disease with or without the exposure at work.

[Appellant's Counsel:] And if the idea is, in order for an occupational disease to be allowable, that the condition must not only have developed from that exposure, but also that the individual would not have developed this condition but for distinctive conditions of employment, if that's the legal standard, how would you answer that?

[Dr. Boswell:] I know it's the legal standard. And you're absolutely correct, it is not due to, on a probability side, as to her work as a flight attendant.

CP at 408-09.

On cross-examination, Dr. Boswell clarified that even though his report stated that the COVID exposure most likely occurred in the work setting, what he actually meant was that it was equally likely her exposure occurred in the working setting as opposed to somewhere else because "she could have been exposed anywhere." CP at 388.

Physician's assistant, Kerry Scarvie, began treating Azorit-Wortham on April 8, 2020 and assumed the role of her attending provider regarding her COVID-19 diagnosis and workers' compensation claim. She testified that

the COVID exposure more likely than not occurred during the work setting. It was actually like a perfect storm. Clearly, she was exposed to many people at the airports, shuttles, hotels, as well as on the airplane. She was working in a confined space in close proximity, less than 6 feet away from people without a mask for extended periods of time. After reading her testimony about her relevant 14 days prior to her COVID exposure and home precautions, I believe this further substantiates it was more probable than not that she contracted COVID while at work

[Azorit-Wortham's Counsel:] To the extent your answer didn't provide specifically this, I'll ask you: What are the distinctive conditions of [Azorit-Wortham's] employment as a flight attendant that influenced your opinion?

4

[Scarvie:] Well, the fact that she was exposed to many people, worked in a very confined space, was without a mask, and was told by Alaska Airlines that the pilot she had flown with was positive for COVID.

[Azorit-Wortham's Counsel:] Now, if I modify those facts for you a little bit and ask you to assume that she didn't actually fly with the COVID-positive pilot; she boarded a plane that the COVID-positive pilot had just been on. So she actually wasn't on the same plane. Does that change your ultimate causation opinion in this case?

[Scarvie:] No.

CP at 430-31.

Scarvie stated that she thought Azorit-Wortham got COVID "from respiratory droplets from another person" and not from touching a surface. CP at 441. However, she also stated she must have "missed" Azorit-Wortham's testimony that she was going to grocery stores during the two weeks prior to March 30. CP at 450.

The Board found Dr. Boswell's testimony more persuasive than Scarvie "because of his expertise in occupational medicine and environmental health, his understanding of the COVID-19 virus and the changing nature of how it is transmitted, precautions that work, and the constant changing nature of the virus, and [the fact that] he had a better foundation to make a causation opinion." CP at 49.

The Board ultimately concluded that "the preponderance of the evidence simply does not establish Ms. Azorit-Wortham's COVID-19 condition arose naturally and proximately out of the distinctive conditions of her employment." CP at 50. The Board reversed the order awarding benefits and remanded for L&I to reject the claim. Azorit-Wortham appealed the Board's decision to superior court.

II.      JURY INSTRUCTIONS AND TRIAL

At trial, the administrative record was read to the jury. The court gave jury instructions on the definition of occupational disease and the traveling employee doctrine.

Jury instruction 14 was a pattern jury instruction defining occupational disease. 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 155.30, at 111 (7th ed 2022) (WPI). It stated:

> An occupational disease is a disease or infection that arises naturally and proximately out of the worker's employment.
> A disease arises naturally out of employment if the disease comes about as a matter of course as a natural consequence of distinctive conditions of the worker's employment. It is not necessary that the conditions be peculiar to, or unique to, the particular employment. A disease does not arise naturally out of employment if it is caused by conditions of everyday life or of all employments in general.
> A disease arises proximately out of employment if the conditions of the workers' [sic] employment proximately caused or aggravated the worker's disease.

CP at 517.

Jury instruction 9, regarding the traveling employee doctrine, was not a pattern jury instruction. *See* chapter 155 WPI. Azorit-Wortham submitted a proposed jury instruction on the traveling employee doctrine "based on the case of *Ball-Foster Glass Container Co. v. Giovanelli*.[3]" Br. of Resp't (Azorit-Wortham) at 7. According to Azorit-Wortham, "[t]he trial court ultimately used as Instruction No. 9 a slightly different version of the [proposed] instruction which eliminated the language regarding industrial injury and referenced only occupational disease." Br. of Resp't (Azorit-Wortham) at 8.

The final version of instruction 9 provided,

> A traveling employee is subject to workers' compensation coverage throughout the duration of the business trip, including during travel, hotel stays and meals at restaurants. Any occupational disease occurring during such business travel is covered by the Washington State Industrial Insurance Act.

CP at 512.

---

[3] 163 Wn.2d 133, 177 P.3d 692 (2008).

Alaska Airlines took exception to the trial court's jury instruction 9 regarding the traveling employee doctrine on the basis that the traveling employee doctrine does not apply to occupational diseases like the one at issue here, but instead applies to industrial injuries only.

The jury ultimately returned a verdict in favor of Azorit-Wortham, finding that the Board was incorrect in determining her COVID-19 claim should not be covered as an occupational disease.

Alaska Airlines appeals.

## ANALYSIS

I.    JURY INSTRUCTIONS

Alaska Airlines argues the trial court erred by giving a jury instruction on the traveling employee doctrine in the context of an occupational disease. It argues this instruction misstated the law and was, therefore, prejudicial. Azorit-Wortham and L&I argue, while there is no case law in Washington applying the traveling employee doctrine to an occupational disease, there is no policy reason to exclude application of the doctrine from occupational disease cases. We agree with Alaska Airlines.

A.    Standard of Review

We review jury instructions "de novo for errors of law." *Anfinson v. FedEx Ground Package Sys.*, *Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012).

B.    Legal Principles

To prove an occupational disease under the Industrial Insurance Act, a claimant must show their disease arose (1) "naturally" and (2) "proximately" from their employment. RCW

51.08.140;[4] *Dennis v. Dep't of Lab. & Indus.*, 109 Wn.2d 467, 481, 745 P.2d 1295 (1987); *Potter v. Dep't of Lab. & Indus.*, 172 Wn. App. 301, 311, 289 P.3d 727 (2012). To show that a disease arose "naturally" from employment, a claimant must establish

> that his or her occupational disease came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment. The conditions need not be peculiar to, nor unique to, the worker's particular employment. Moreover, the focus is upon conditions giving rise to the occupational disease . . . and not upon whether the disease itself is common to that particular employment. The worker, in attempting to satisfy the "naturally" requirement, must show that his or her particular work conditions more probably caused his or her disease . . . than conditions in everyday life or all employments in general; the disease . . . must be a natural incident of conditions of that worker's particular employment. Finally, the conditions causing the disease . . . must be conditions of *employment*, that is, conditions of the worker's particular occupation as opposed to conditions coincidentally occurring in his or her workplace.

*Dennis*, 109 Wn.2d at 481.

Next, to show the disease arose "proximately" from employment, the claimant must establish through "competent medical testimony" that "the disease is probably, as opposed to possibly, caused by the employment." *Id.* at 477. To show this causal connection, "it is sufficient if 'a reasonable person can infer' from the medical testimony, in conjunction with lay testimony, 'that the causal connection exists.'" *Street v. Weyerhaeuser Co.*, 189 Wn.2d 187, 197, 399 P.3d 1156 (2017) (quoting *Sacred Heart Med. Ctr. v. Carrado*, 92 Wn.2d 631, 637, 600 P.2d 1015 (1979)). As such, there are no "magic words" required to prove causation. *Street*, 189 Wn.2d 197.

C.      The Travelling Employee Doctrine Does Not Apply to Occupational Diseases

Here, the trial court instructed the jury on the definition of occupational disease and the traveling employee doctrine. No party disputes the definition of occupational disease given. However, Alaska Airlines argues the trial court erred by giving an instruction on the traveling

---

[4] The statute defines 'occupational disease' as "such disease or infection as arises naturally and proximately out of employment under the mandatory or elective adoption provisions of this title."

employee doctrine in the context of an occupational disease because the doctrine is inconsistent with what is required to show an occupational disease.

In *Giovanelli*, our Supreme Court adopted the traveling employee doctrine to expand the coverage of employees injured while traveling. 163 Wn.2d 133, 142-43, 177 P.3d 692 (2008). Since then, Washington courts have applied the traveling employee doctrine only in the context of industrial injury claims.[5]

In *Giovanelli*, the court considered whether a firebrick mason, Giovanelli, traveling for work, was still in the course of employment when, on his day off, he took a stroll to the park with his supervisor and was struck by a car. *Id.* at 137-140. The court held that, under the traveling employee doctrine, "[a] traveling employee is generally considered to be in the course of employment continuously during the entire trip, except during a distinct departure on a personal errand." *Id.* at 142. The court explained that

> [t]he rationale for . . . extended coverage is that when travel is an essential part of employment, the risks associated with the necessity of eating, sleeping, and ministering to personal needs away from home are an incident of the employment even though the employee is not actually working at the time of injury.

*Id.*

The court concluded that Giovanelli's injury was covered because he "did not distinctly depart from the course of employment at the time of his injury." *Id.* at 154. In reaching this conclusion, the court distinguished occupational diseases from injuries, noting that while an injury

---

[5] We can find no case where a Washington court applied the traveling employee doctrine to a claim other than an industrial injury. L&I cites to two cases from New York to support its argument that occupational diseases should be treated the same as injuries for purposes of the traveling employee doctrine. However, L&I provides no argument for why these cases should be viewed as persuasive authority.

need not "arise out of" employment, "[t]he 'arising out of' element applies . . . to occupational illnesses and diseases." *Id.* at 1441 n.2.

This distinction highlights the critical difference between what a claimant must show for an industrial injury versus an occupational disease. While the traveling employee doctrine extends coverage for a worker *injured* during such activities as "eating, sleeping, and ministering to personal needs away from home," such an expansion is allowable because industrial injuries need not "arise out of employment," as is required for occupational diseases. *Id.* at 142; *Dennis*, 109 Wn.2d at 480-81. Eating, sleeping, and ministering to personal needs away from home, rather than being distinctive conditions of one's employment, are instead conditions of everyday life. Conditions of everyday life are specifically excluded as conditions from which an occupational disease can "arise out of." *See Street*, 189 Wn.2d at 199 ("'Arises naturally' means that the conditions of a worker's particular employment are distinctive, i.e., different from, employments in general or activities of daily living."). As such, the traveling employee doctrine has not been applied to occupational diseases.

L&I argues the instruction on the traveling employee doctrine was appropriate because it is "relevant to explain that distinctive conditions extend to not just those things that occur while performing in-flight tasks of a flight attendant, but to all attendant tasks of the job, including staying in hotels and dining away from home." Br. of Resp't (L&I) at 43. But this expansion is inconsistent with the definition found in *Dennis*. Distinctive conditions of employment *are* those things that occur while performing in-flight tasks of a flight attendant and, pointedly, are not those that are conditions of everyday life. Indeed, the definition found in *Dennis* specifically excludes such conditions as those from which an occupational disease may "arise out of." 109 Wn.2d at 480. Instead, to show an occupational disease, *Dennis* requires that an occupational disease come

about as a "natural consequence or incident of *distinctive conditions of his or her particular employment*." *Id.* at 481 (emphasis added). By comparison, the court in *Giovanelli* allowed coverage precisely because the claimant there did not need to make this showing and likely could not have—it is clear that walking to the park while on a work-related trip would not arise naturally out of the distinctive conditions of his employment. Extending the traveling employee doctrine to occupational diseases would run afoul of supreme court precedent.

Azorit-Wortham argues that "there is no rational reason that the [t]raveling [e]mployee doctrine should not apply to a covered worker with an occupational disease in the same way it applies to a covered worker with an industrial injury." Br. of Resp't (Azorit-Wortham) at 23. Azorit-Wortham explains that the traveling employee doctrine "is applied to determine whether a worker is within the course of employment, as opposed to being on the worker's own time on a 'distinct departure on a personal errand.'" Br. of Resp't (Azorit-Wortham) at 24 (quoting *Giovanelli*, 163 Wn.2d at 142). Further, she argues "if a worker is covered by the act for one purpose (industrial injury), then that worker is also, necessarily, covered for all purposes, including occupational disease."[6] Br. of Resp't (Azorit-Wortham) at 25.

However, these arguments fail to account for the distinction noted by our Supreme Court in *Giovanelli*. There, in discussing how Washington has broadened the scope of coverage for injured employees, the court distinguished Washington's approach from most other jurisdictions.

> The general coverage provision in the workers' compensation acts of 43 states as well as the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, all share the language first used in the "British Compensation Act formula: injury 'arising out of and in the course of employment.'"

---

[6] This argument does not account for the fact that while the Industrial Insurance Act may treat injuries and occupational diseases the same for *compensation* purposes (RCW 51.32.180), it does not treat them the same for *all* purposes-i.e. there are different requirements that must be shown to prevail on an injury vs. an occupational disease claim. Further, the Act does not speak to the traveling employee doctrine which is at issue here.

11

> . . . . Under Washington law, there is no requirement that an injury "arise out of" employment, only that the worker was within "the course of employment" when injured. The language of the statute shows the intent of the Washington Legislature to adopt a broader and more comprehensive statute than other states.

*Giovanelli*, 163 Wn.2d at 140-41 (internal statutes omitted) (internal footnote omitted).

The court pointed out, however, that the "arising out of" requirement still applies in the context of occupational diseases. *Id.* at 140 n.2. There is nothing in *Giovanelli* to suggest the traveling employee doctrine applies in the context of occupational diseases. Further, since the court specifically distinguished between the requirements for occupational diseases versus injuries, addressed the broadening of coverage for injuries only, and has applied the traveling employee doctrine only in industrial injury cases, we hold the traveling employee doctrine does not apply to occupational diseases.

### D. Jury Instructions and Harmless Error

"'Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law.'" *Anfinson*, 174 Wn.2d at 860 (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). If one of these elements is missing, "the instruction is erroneous." *Id.* Such error is reversible "only if it prejudices a party." *Id.* However, "[p]rejudice is presumed if the instruction contains a clear misstatement of law." *Id.* The only way to overcome such a presumption is by showing that the misstatement of law was harmless. *Paetsch v. Spokane Dermatology Clinic, P.S.*, 182 Wn.2d 842, 849, 348 P.3d 389 (2015). "'A harmless error is an error which is *trivial*, . . . *formal*, . . . *merely academic*, . . . was not prejudicial to the substantial rights of the party assigning it, and *in no way affected the final outcome of the case*.'" *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977) (italics in original) (internal quotation marks omitted) (quoting *State v. Golladay*, 78 Wn.2d 121, 139, 470 P.2d 191 (1970)).

12

Here, jury instruction 9 misstated the law by applying the traveling employee doctrine to occupational diseases. Therefore, the instruction was presumptively prejudicial.

Azorit-Wortham does not argue the error was harmless. L&I argues that even if there was error, it was harmless. It argues "Alaska Airlines cannot demonstrate prejudice when [Scarvie's testimony], separate from any hotel stays or meals at restaurants as referenced in Instruction 9, [met] the definition of occupational disease." Br. of Resp't (L&I) at 46. L&I provides no argument for why this legal error that addressed the very heart of the issue at trial was "trivial" or "in no way affected the final outcome of the case." *See Wanrow*, 88 Wn.2d at 237 (quoting *Golladay*, 78 Wn.2d at 139). Without any legal basis, the erroneous instruction allowed the jury to find coverage for an occupational disease that arises out of daily activities and not distinctive conditions of employment. We conclude the error would have impacted the outcome of the trial and therefore was not harmless.

## CONCLUSION

We hold that the trial court erroneously instructed the jury on the traveling employee doctrine in the context of an occupational disease. This legal error was presumptively prejudicial and not harmless, and the presumption has not been overcome. Therefore, we reverse and remand for a new trial.

_____
Veljacic, A.C.J.

I concur:

_____
Lee, J.

13

GLASGOW, J. (dissent)—Because the majority's holding effectively means that the traveling employee doctrine could never apply to occupational diseases, I respectfully dissent.

RCW 51.32.010 (governing occupational injuries) and .180 (governing occupational diseases) provide that an employee "injured *in the course of [their] employment*" or "who suffers disability from an occupational disease *in the course of employment*" is entitled to workers' compensation. RCW 51.32.010, .180 (emphasis added). An "occupational disease" is a "disease or infection as arises naturally and proximately out of employment." RCW 51.08.140.

The Washington Supreme Court has explained that, for occupational injuries, a worker does not have to be performing their work duties for an injury to be compensable. *Ball-Foster Glass Container Co. v. Giovanelli*, 163 Wn.2d 133, 142, 177 P.3d 692 (2008) "It is sufficient if the injury arises out of a risk that is sufficiently incidental to the conditions and circumstances of the particular employment." *Id*. Additionally, "[i]n doubtful cases, the act is to be construed liberally in favor of compensation for the injured worker." *Id*.

Usually, a worker's injury is compensable if they are doing something incidental to their work duties, including, for example, eating on-site during a lunch break. *Young v. Dep't of Lab. & Indus.*, 200 Wash. 138, 145, 93 P.2d 337 (1939). The traveling employee doctrine expands the coverage of incidental activities for employees who must travel in the course of their employment. In *Giovanelli*, the Supreme Court explained that "when travel is an essential part of employment, the risks associated with the necessity of eating, sleeping, and ministering to personal needs away from home are an incident of the employment even though the employee is not actually working at the time of injury." 163 Wn.2d at 142. Therefore, a "traveling employee is generally considered to be *in the course of employment* continuously during the entire trip, except during a distinct departure on a personal errand." *Id.* Within this, the personal comfort doctrine extends coverage

14

"to such acts as eating, resting, drinking, going to the bathroom, smoking, and seeking fresh air, coolness, or warmth," as long as the extent of the deviation is not "so substantial that an intent to abandon the job temporarily may be inferred." *Id*. at 150. And while a nontraveling employee may satisfy these needs at home outside of work, a "traveling employee must face the perils of the street in order to satisfy basic needs, including sleeping, eating, and seeking fresh air and exercise." *Id*. at 151.

It is true that no Washington court has expressly applied the traveling employee doctrine to occupational diseases. Majority at 8-9. But the plain language of RCW 51.32.010 (governing occupational injuries) and .180 (governing occupational diseases) each contain a "course of employment" requirement. Neither the legislature nor any court has stated that the traveling employee doctrine, which arose out of the "course of employment" analysis, does *not* apply to occupational diseases. Indeed, the legislature intentionally used the same language to discuss the compensability of both occupational diseases and injuries. Thus, I would conclude that the traveling employee doctrine should apply to determine whether an occupational disease occurred within the course of employment, just as it does for occupational injuries.

The majority holds that meeting the definition of "occupational disease" and applying the traveling employee doctrine are mutually exclusive such that the traveling employee doctrine could *never* apply in an occupational disease case. Majority at 10. I disagree. While few cases may meet both standards, there should be a case-by-case determination of whether a disease meets both tests.

The Supreme Court has stated that to satisfy the "arising naturally" requirement of RCW 51.08.140, a worker must show that their particular work conditions more probably caused their disease "than conditions in everyday life or all employments in general." *Dennis v. Dep't of Lab.*

*& Indus.*, 109 Wn.2d 467, 481, 745 P.2d 1295 (1987). And twenty years later, the Supreme Court wove into the traveling employee doctrine a recognition that traveling employees must "satisfy basic needs, including sleeping, eating, and seeking fresh air and exercise" in the course of traveling for employment. *Giovanelli*, 163 Wn.2d at 151. But I would not read these provisions to be mutually exclusive. The very nature of the traveling employee doctrine is to recognize that when a worker is travelling as a distinctive condition of their work, what would typically be everyday activities if a worker did them at home become something more—conditions of the worker's employment. In other words, when done as part of a job that inherently requires travel, activities like eating and sleeping are more than simple everyday activities because they must occur away from home as a requirement of the person's job. *See id*. at 142, 151.

Of course, just as not every injury is an occupational injury, not every disease contracted during work travel would qualify for coverage. But for workers such as flight attendants, the act of travel is itself fundamental to their particular employment. *See Giovanelli*, 163 Wn.2d at 142. Flight attendants often necessarily end their work shift in a different city, state, or country than where they started their shift. In cases such as these, I would say that an occupational disease more probably than not contracted as a result of travel during nonwork hours—such as deadheading a flight home or staying in a hotel in a foreign city—could "arise[] naturally and proximately out of employment" under the statute. RCW 51.08.140.

Therefore, I would not conclude that the traveling employee doctrine could never apply to an occupational disease claim. Flight attendants are a prime example of a profession where the fundamental nature of the occupation involves travel, additional travel to return home or reach the next workplace is certainly incidental to the conditions of employment, and a disease could arise naturally and proximately out of this fundamental condition for employment.

16

For the foregoing reasons, I respectfully dissent.

GLASGOW, J.